**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Concerned Citizens and Retired Miners Coalition, et al., | No. CV-16-03115-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| United States Forest Service, et al., | |
| Defendants. | |

Plaintiffs, a group of public interest organizations and the San Carlos Apache Tribe, brought suit against the United States Forest Service and some of its supervisors and officers. The Court allowed Resolution Copper Mining, LLC ("Resolution") to intervene as a Defendant. Plaintiffs challenge the Forest Service's approval of a plan to gather environmental data related to the possible development of a large copper mine near Superior, Arizona. Plaintiffs filed motions for summary judgment, and Defendants filed cross-motions. For the reasons that follow, the Court will deny Plaintiffs' motions for summary judgment and grant Defendants' motions.

## I.    Background.

Resolution proposes to develop a large-scale underground copper mine near the Town of Superior, Arizona ("Main Mine"). The Main Mine would be constructed on land that Congress has directed the Forest Service to trade to Resolution in exchange for other land. *See* 16 U.S.C. § 539p. Resolution has submitted a General Mining General

Plan of Operations ("Main Mine Proposal"). The Forest Service is in the process of developing an environmental impact statement ("EIS") for the Main Mine Proposal. That proposal and the EIS are not at issue in this case.

Resolution proposes to construct a mine tailings storage facility ("TSF") in the Tonto National Forest in Pinal County, Arizona, also near the Town of Superior. A.R. 15192-93, 15196. To collect environmental data needed for the EIS on the Main Mine Proposal, and to be used in deciding whether to place the TSF at the proposed location and in designing and operating the TSF if it is approved, Resolution proposes to conduct a baseline assessment of groundwater and subsurface conditions in the proposed TSF location. The plan for this data gathering is contained in a Plan of Operations for Baseline Hydrological and Geotechnical Data Gathering Activities ("Baseline Project"). A.R. 15192.

The Baseline Project is the subject of this litigation. The Forest Service approved the project after conducting an environmental assessment ("EA") and issuing a Finding of No Significant Impact ("FONSI"). Plaintiffs challenge the EA as insufficient under several federal statutes.

It is important to note that approval of the Baseline Project does not constitute approval of the Main Mine or the TSF. Those projects will be approved, if at all, only after completion of the EIS. The Baseline Project is limited in scope and duration. It includes (1) installing 16 groundwater monitoring wells, affecting approximately 4.21 acres; (2) installing 41 geotechnical drill holes and piezometers, affecting about 0.27 acres; (3) constructing 32 geotechnical test trenches, affecting approximately 1.28 acres; (4) improving about 12 miles of existing Forest Service roads; (5) creating two storage yards for materials, affecting about 2.19 acres; (6) improving and maintaining temporary access roads on previously disturbed areas, affecting approximately 3.94 acres; and (7) creating short-term temporary access roads to bring a tracked drill rig and a service truck to off-road locations, affecting 7.07 acres. A.R. 15193. The temporary access roads would be developed on already existing unauthorized roads. A.R. 15211. The

short-term temporary access roads would be used for only 24 to 48 hours, and then returned to their native state. *Id.* The test trenches would also be filled and restored within 48 hours of initial excavation. A.R. 15218.

Once completed, the groundwater wells would be used to gather groundwater data, including water quality, transmissivity, and hydraulic conductivity. A.R. 15212. The geotechnical drill holes and piezometers would be used to study stratigraphy and density of the subsurface and to measure groundwater levels. A.R. 15217. The test trenches would be used to study stratigraphy and other soil characteristics, as well as hydraulic conductivity (through an infiltration test). A.R. 15218. "Construction and installation of the Baseline activities is expected to take approximately six months for the 16 hydrological drill sites, nine to ten months for the 41 geotechnical drill sites, and three to four months for the 32 test trenches. Construction and installation would occur concurrently[.]" A.R. 15208.

During the first year following construction, groundwater monitoring wells would be sampled monthly. This would require a person to travel to each well and collect a groundwater sample. During years three through ten, the wells would be sampled quarterly. At the end of the ten-year project, any remaining areas would be reclaimed. A.R. 15218.

The Baseline Project includes more than 40 specific measures designed to protect the environment and cultural resources. A.R. 15219-23. In addition, the EA developed 16 mitigation measures. A.R. 15225-26.

At the beginning of the EA process, the Forest Service distributed a scoping letter to more than 300 interested parties and agencies, published the scoping plan in local newspapers and online, and provided a 30-day period for scoping comments. A.R. 15201. More than 200 comments were received and evaluated. A.R. 15203. The Forest Service also initiated consultation with ten Native American tribes. A.R. 15202. These efforts included letters, invitations to engage in government-to-government consultations, and various meetings. *Id.*

The Forest Service issued a draft EA in March 2015, followed by a public comment period. A.R. 9696, 10036. The final EA and FONSI were published in January 2016. A.R. 15178, 15753. An additional 45-day objection period followed. A.R. 15354; 36 C.F.R. Part 218. The public, including Plaintiffs, provided many comments to the Forest Service throughout this process.

Plaintiffs have now filed this action to challenge the validity of the EA. Plaintiffs argue that the EA violates the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the National Defense Authorization Act ("NDAA"), as well as regulations related to these statutes.

On June 29, 2017, the Forest Service filed a Notice of New Information (Doc. 50) that will be discussed below. The notice states that the construction phase of the Baseline Project is completed and that the project is now in the monitoring phase. Doc. 50-1 at 2. "All ground disturbing drilling and trenching activities for the Baseline project are completed as of February 2017." *Id.* "Disturbances associated with drilling and trenching activities for the Baseline project have been reclaimed[.]" *Id.* To complete the monitoring that constitutes the rest of the project, "[t]he well sites are visited by a two-person crew and data is downloaded from data loggers via laptop computers monthly from each of the wells for the initial 12 months, then on a quarterly basis throughout the remaining authorization period[.]" *Id.*

Apparently, because Plaintiffs never sought to preliminarily enjoin the project, improvements of the roads and construction of the monitoring wells, boreholes, and test trenches proceeded. The Court learned this information only after the balance of this order was drafted. No party has suggested that issues raised in the summary judgment briefing are moot, and the Court assumes that NEPA compliance is still required because the project remains ongoing, albeit at the greatly reduced monitoring level. The Court accordingly will address the issues raised by the parties and will do so, as the parties do in their briefs, as though the project was yet to be implemented.

## II.    Legal Standards.

A court may set aside a final agency action under the Administrative Procedure Act ("APA") only if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)). The APA does not allow a court to overturn an agency action simply because the court disagrees with the action. *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). Review under the APA generally is restricted to the administrative record. *See* 5 U.S.C. 706; *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

NEPA "'is our basic national charter for protection of the environment.'" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1185 (9th Cir. 2008) (quoting 40 C.F.R. § 1500.1(a)); *see* 42 U.S.C. § 4331. "NEPA is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" *Sierra Club v. Bosworth,* 510 F.3d 1016, 1018 (9th Cir. 2007) (citation omitted). NEPA requires federal agencies to perform environmental analysis before taking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). It "seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger [public] audience." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.,* 545 F.3d 1147, 1153 (9th Cir. 2008) (internal quotations omitted).

An EA is used to provide sufficient evidence and analysis to determine whether to make a finding of no significant impact or to prepare a more detailed EIS. 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.11. The regulations define an EA as "a concise public

document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. The EA should include "brief discussions of the need for the proposal, of alternatives . . . , of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id*. An EA is reviewed using the arbitrary and capricious standard discussed above. *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 598 (9th Cir. 2010).

**III.    Analysis.**[1]

**A.    Is the Main Mine Proposal a Connected Action?**

"[A]n agency is required to consider more than one action in a single EIS if they are 'connected actions,' 'cumulative actions,' or 'similar actions.'" *Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1067 (9th Cir. 1995) (citing 40 C.F.R. § 1508.25). Plaintiffs contend that the Main Mine Proposal is a "connected action" under the relevant regulations and therefore should have been included in the EA of the Baseline Project. Plaintiffs do not contend that the Main Mine Proposal is a "cumulative" or "similar" action.

Actions are considered "connected" if they meet any of the following three criteria:

> (i) Automatically trigger other actions which may require environmental impact statements.

> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

---

[1] Plaintiffs make many cursory arguments in their briefs. *See, e.g.*, Doc. 38 at 24 (arguing that the Forest Service did not comply with the Organic Act and its mining regulations), 36 (arguing that the Forest Service did not provide sufficient baseline data for wildlife, air quality, and recreation conditions in the project area). The Court has considered, but will not address, these undeveloped arguments. They fall far short of the showing needed to overturn an agency decision.

40 C.F.R. § 1508.25(a).

The Ninth Circuit "appl[ies] an 'independent utility' test to determine whether multiple actions are connected so as to require an agency to consider them in a single NEPA review." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002) (citation omitted). "Where each of two projects would have taken place with or without the other, each has 'independent utility' and the two are not considered connected actions." *Id.* (citation omitted). "Although federal agencies are given considerable discretion to define the scope of NEPA review, connected, cumulative, and similar actions must be considered together to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Id.* (citation and internal quotations omitted); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006).

Considering the three criteria set forth in 40 C.F.R. § 1508.25(a), the Court cannot conclude that the Baseline Project and the Main Mine Proposal are connected actions.

First, Plaintiffs do not contend that the Baseline Project will automatically trigger other actions which may require environmental impact statements. The Baseline Project will generate data related to the proposed location for the TSF, and that data will be used in the EIS for the Main Mine, but the Main Mine will not be "automatically" triggered by the project. *See* 40 C.F.R. § 1508.25(a)(i); A.R. 15625.

Second, Plaintiffs have not shown that the Main Mine cannot or will not proceed unless the Baseline Project is undertaken. The Main Mine, if approved, will be developed on federal land that will be transferred to Resolution and become private land. Doc. 41 at 11. The Baseline Project will gather data on federal land that will remain in the Tonto National Forest – it is not part of the land exchange with Resolution. *Id.* The project will gather data to evaluate the proposed site for the TSF, but Plaintiffs have identified nothing in the record to show that the Main Mine will not continue if the Baseline Project is rejected. Rather, it appears that failure to continue with the Baseline

Project will impact only one small part of the Main Mine Proposal – the location of the TSF.

Other locations have been considered for the TSF. As the Forest Service explained in response to public comments:

> Authorization of the Baseline Plan would be an independent federal action that would not trigger authorization of the [Main Mine Proposal], and the Resolution Copper mine is not dependent on authorization of the Baseline Plan. As discussed in Section 3.3.10.1 of the [Main Mine Proposal], Resolution Copper evaluated a number of potential sites for tailings storage, including sites on National Forest System land, State land and private land. Resolution Copper selected the TSF location proposed in the [Main Mine Proposal] as the "most viable and least objectionable" location for the TSF. There is no information to suggest that development of the Resolution Copper Mine could not occur without authorization of the Baseline Plan or without authorization of the TSF as proposed in the [Main Mine Proposal].

A.R. 15523.

Plaintiffs contend that the record reflects only one proposed location for the TSF and that any claim that Resolution may decide to relocate the facility is speculative. Doc. 44 at 17. But the question before the Court is whether the Main Mine "might reasonably [be] completed without the existence of the" Baseline Project. *Great Basin Mine Watch*, 456 F.3d at 969. The fact that Resolution presently might not be considering other TSF sites does not show that other sites could not be used, particularly when the record shows that other sites have been actively considered in the past.

Third, the Baseline Project and the Main Mine Proposal, although clearly related, are not interdependent parts of a larger action that depend on the larger action for their justification. As noted above, the Main Mine can proceed without the Baseline Project, which focuses on only one of several possible locations for one small part of the mine – the TSF. And the Baseline Project will supply data and information that can be used to inform separate actions and proposals. Doc. 41 at 34; A.R. 10638-9. As Plaintiffs themselves note, "[t]he Baseline Plan area includes, and is adjacent or near to, other

current, recent, and proposed mineral operations on the National Forest, including the 'Copper King' exploration project, the 'Red Top' exploration project, and the 'Superior West Exploration Plan,' among others projects, as well as the Resolution Cooper Mine." Doc. 38 at 10. Furthermore, courts within the Ninth Circuit have found that data gathering and "research [have] independent value, distinct from the action itself." *Ocean Mammal Inst. v. Cohen*, No. 98-CV-160, 1998 WL 2017631, at *8 (D. Haw. Mar. 9, 1998), *aff'd,* 164 F.3d 631 (9th Cir. 1998); *accord. Greater Yellowstone Coal. v. Reese*, 392 F. Supp. 2d 1234, 1240 (D. Idaho 2005).

Given these considerations, the Court finds that the Baseline Project has independent utility. Its value is not limited to possible construction and operation of the Main Mine. Nor is the EIS dependent on the Baseline Project. The independent utility of the Baseline Project and the Main Mine EIS suggests that they are not connected actions within the meaning of the regulations. *Native Ecosystems Council*, 304 F.3d at 894.

District courts in this circuit have reached the same conclusion when evaluating data-gathering projects related to other larger undertakings. *Greater Yellowstone Coalition*, for example, considered the EA for an exploratory project to gather data related to expansion of a phosphate mine. 392 F. Supp. 2d at 1237. Like the Baseline Project, the exploratory project included construction of wells and roads and would gather "geologic, hydraulic, and other environmental data." *Id.* at 1237-8. The plaintiff argued that the exploratory project should have been considered in a single EIS with the mine expansion proposal because they were connected actions. *Id.* at 1239-40. The district court disagreed. Noting that the data gathered by the exploratory project would be used in an EIS of the mine expansion, the court emphasized that this did not mean that the mine expansion could not or would not proceed if the exploratory project was not approved. *Id.* at 1240. The court noted that the area covered by the exploratory project was only a small portion of the intended expansion, and that rejecting the project would only stop that small portion from going forward. *Id*. The court noted that "the exploratory project [did] not depend on the [mine expansion] projects for its justification" because,

although "the information from the exploratory project may be used in the [mine expansion] proposal, the exploratory project has a stand-alone purpose – gathering information to allow mining in the South Manning Creek area." *Id.* This reasoning applies fully to the Baseline Project.

*Ocean Mammal Institute* considered an EA for a project to conduct low-frequency sonar tests on marine life. 1998 WL 2017631, at *3. The tests would be used to develop and implement a low-frequency active sonar system ("LFA System") on military submarines, for which preparation of a separate EIS had already commenced. *Id.* at *5. The plaintiffs argued that the EA violated NEPA because the sonar tests and the LFA System were connected actions. *Id.* at *7. The court rejected this argument, finding a "meaningful distinction between the actions; one is research and the other is deployment of a submarine detection system. The research does not commit the government to deploying the LFA System, and the research does not determine the outcome of the EIS being prepared for the LFA System." *Id.* The court emphasized that "research has independent value, distinct from the action itself." *Id.* at *8. The same is true here.

As Defendants note, Plaintiffs' position would create an impossible dilemma. "The Forest Service will use the data collected from [the Baseline] Project to prepare a forthcoming EIS for the [Main Mine Proposal.]" Doc. 41 at 30. As a result, "[t]here is no logical way to wrap the proposed Baseline Activities data collection into the [EIS] being conducted on the [Main Mine], because you can't make the decision on the [Main Mine] until you have baseline data collected from the proposed Baseline Activities." *Id.* at 35 (quoting A.R. 10641). Stated differently, the Forest Service cannot evaluate whether to collect data and, at the same time, use that data to perform an EIS analysis. The data must precede the analysis. Plaintiffs do not respond to this practical problem. Doc. 44 at 15.[2]

---

[2] Plaintiffs cite to a reply brief filed by Defendants in a separate action. Doc. 44 at 15-16 (citing reply brief from *Save Our Cabinets v. U.S. Dep't of Agriculture*, No. 9:16-cv-00053-DWM (D. Mont.)). Defendants argued in that case that "NEPA required the agency to review the baseline data gathering and the main mine in one EIS as they were undoubtedly 'connected actions' under NEPA." *Id.* at 15 (emphasis removed). But as

Delaying a decision on whether data should be collected until the Forest Service undertakes an EIS on the Main Mine would deprive the EIS of important data. It would thwart NEPA's purpose "to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger [public] audience." *N. Idaho Cmty. Action Network*, 545 F.3d at 1153 (internal quotations omitted). As the court found in *Ocean Mammal Institute*, requiring a research project to be assessed together with the larger action "would trap defendants in an endless cycle whereby they are required to do research for an EIS for the [larger project], but are enjoined from doing the research because it must be included in an EIS for [that larger project]." 1998 WL 2017631, at *8.

Citing the Ninth Circuit's decision in *Native Ecosystems*, Plaintiffs argue that Defendants are "breaking the [Main Mine] project up into smaller portions to avoid disclosing the impacts and informing the public of the full impacts of the proposal at the earliest possible time[.]" Doc. 44 at 17. But an agency cannot inform the public about the full impacts of a project until it has the data necessary to asses that impact. And the concerns expressed in *Native Ecosystems* are not present here – the Forest Service will assess all of the Main Mine Proposal in a separate EIS; it is not dividing a larger project into smaller actions that individually do not have a significant impact. 304 F.3d at 894; *see also Klamath-Siskiyou Wildlands Ctr. v. Graham*, 899 F. Supp. 2d 948, 961 (E.D. Cal. 2012); *All. to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army*, 288 F. Supp. 2d 64, 80-81 (D. Mass. 2003), *aff'd*, 398 F.3d 105 (1st Cir. 2005).

Plaintiffs "must show that the Forest Service was arbitrary and capricious in failing to prepare one comprehensive environmental statement." *Native Ecosystems*, 304

---

Defendants note, that case is distinguishable because Defendants already had adequate baseline data to assess the environmental effects of the mine at issue. Doc. 46 at 7; Doc. 44-1 at 19-20. The exploratory project could be assessed in the same EIS as the mine because the exploratory project was designed to aid facility design. Doc. 41-1 at 19. Here, the Baseline Project is critical to assessing the impact of the TSF and completing an EIS of the Main Mine Proposal.

F.3d at 894. Plaintiffs have not made this showing. The Court can see no basis to conclude that the Forest Service is dividing one large project into smaller segments in order to avoid its obligation to conduct a full and complete environmental review. To the contrary, the Baseline Project will provide data that is highly relevant to the Main Mine Proposal EIS, as well as generate valuable data in an area of significant mining activity.

### B. Was there Sufficient Public Review?

The draft EA did not address the cumulative impact of the Main Mine Proposal, but the impact was addressed in the final EA. *See* A.R. 15237, 15251-53. Plaintiffs contend that the omission of the cumulative impact analysis from the draft EA deprived the public of an opportunity to review and comment on that issue during formulation of the EA. Doc. 38 at 13-16.

"One of the twin aims of NEPA is active public involvement and access to information." *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1511 (9th Cir. 1997) (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989)). In support of this aim, the implementing regulations provide: "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b). *See also* 40 C.F.R. §§ 1502.4(b), 1506.6.

The Forest Service did not address the cumulative impact of the Main Mine Proposal in the draft EA because, it said, that proposal was too speculative. A.R. 9750. After receiving public comments, including extensive comments from Plaintiffs, the Forest Service changed its position and included the cumulative impacts analysis in the final EA. A.R. 15237. Plaintiffs note that the Main Mine Proposal was submitted to the Forest Service in November 2013, well before the draft EA, and that they asked that the proposal be considered a reasonably foreseeable action and that its cumulative effects be analyzed in the EA. A.R. 4355, 6854, 10787-92.

In *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers*, 524 F.3d 938, 953 (9th Cir. 2008), the Ninth Circuit considered whether agencies must issue draft EAs for public comment before settling upon a final EA. The court held that "circulation of a draft EA is not required in every case" – a decision that apparently comported with every circuit that has considered the question. *Id.* at 952. The Ninth Circuit provided this guidance: "An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Id*. at 953. The court of appeals found that "[i]nformation about the project was widely disseminated throughout the community and environmental information was reasonably and thoroughly tendered to the public." *Id.* As a result, the court refused to set aside the EA even though a draft of the document had never been issued for public comment. *Id.*

In another case, the Ninth Circuit provided this explanation of NEPA requirements for issuance of an EA: "Although we have not unequivocally defined what sort of public participation is required to meet NEPA's amorphous standards, we have recognized that the level of participation required by NEPA's implementing regulations is not substantial." *California Trout v. F.E.R.C.*, 572 F.3d 1003, 1017 (9th Cir. 2009).

In this case, the Forest Service engaged in public scoping for the Baseline Project by publishing a legal notice of the project plan in two Arizona newspapers in May 2014 and requesting that the public submit comments over the next thirty days. A.R. 9860. Plaintiffs and the larger public were provided with a 127-page draft EA describing the Baseline Project, its likely impact, and the existence of related projects, including the Main Mine Proposal. Plaintiffs and the public had access to the Main Mine Proposal online, and submitted extensive comments urging the Forest Service to consider the Main Mine Proposal when determining the Baseline Project's cumulative impact. A.R. 10791-92; Doc. 41 at 54; Doc. 38 at 13-14. The Forest Service considered these comments and assessed the cumulative impact of the Main Mine in the final EA. A.R. 15237.

As Resolution further notes, the final EA was completed and released, along with a draft FONSI, on January 15, 2016, triggering a 45-day objection period. During this period, any new issues arising after the comment period had closed (including any new information in the final EA) could be raised. A.R. 15161-62. Nine objectors, including Plaintiffs, raised more than 100 issues. A.R. 17560. A team of subject matter experts reviewed each objection and provided written responses (A.R. 17213), and objection resolution meetings were held (A.R. 17337, 17338, 17340, 17342). Based on the objection review and the resolution meetings, modifications were made to the final EA and FONSI. A.R. 17560. 17364-66, 17369-71.

The Ninth Circuit has instructed that "[t]he way in which the information is provided is less important than that a sufficient amount of environmental information – as much as practicable – be provided so that a member of the public can weigh in on the significant decisions that the agency will make in preparing the EA." *Bering Strait*, 524 F.3d at 953 (quotation marks and citation omitted). Considering the totality of the circumstances in this case, Plaintiffs and the public were able "to weigh in with their views and thus inform the agency decision-making process." *Id.* What is more, even with the final EA now having been available for some time, Plaintiffs identify no information they would have provided had the draft EA included a discussion of the cumulative impact of the Main Mine.

Plaintiffs rely on two cases which do not address the standard for determining whether the agency afforded sufficient opportunity for public comment. First, they cite *Te-Moak Tribe* for the proposition that "it is the agency's duty under NEPA, not the public's, to provide the needed information and analysis for public review and comment." Doc. 44 at 12. But *Te-Moak* addressed the standard plaintiffs must satisfy to show that the agency failed to properly consider the cumulative impacts of a proposed project. 608 F.3d at 605. It does not hold that agencies must detail the cumulative impact of all projects eventually addressed in their final EA.

Plaintiffs also cite *Great Basin Resource Watch v. Bureau of Land Management*, 844 F.3d 1095, 1104 (9th Cir. 2016), to argue that an agency cannot rely on new information and analysis that the public did not have a chance to consider. Doc. 44 at 12. But that case dealt specifically with new data compiled by the agency *after* issuance of the final EIS.

The Court concludes that the public had a sufficient opportunity to comment on the EA. Although the draft did not include an analysis of the cumulative impact of the Main Mine Proposal, Plaintiffs and the public were well aware of that proposal, had the ability to study it with care, and provided extensive comments about the proposal and its potential cumulative impact. The Court concludes that the public comment process followed by the Forest Service was reasonable and adequate.[3]

### C. Direct, Indirect, and Cumulative Impact Analysis.

Plaintiffs argue that the EA fails to (1) provide a quantified assessment of impacts to air quality, (2) fully assess cumulative impacts of the Main Mine, and (3) adequately assess cumulative impacts of other projects. Doc. 38 at 21; Doc. 41 at 36.

#### 1. Air Quality.

##### a. Ozone Analysis.

Plaintiffs argue that the EA violates NEPA because it does not quantify or contain analysis of "Ozone levels created or exacerbated by the Project's emissions, let alone the cumulative Ozone level caused by emissions of the other current and reasonably foreseeable future projects when combined with the Project." Doc. 38 at 21.

The Court cannot conclude that the EA erred in failing to quantify or model ozone levels because NEPA does not require that agencies employ any "particular analytic protocol" when determining the environmental impact of an action. *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997). The agency "is not required to conduct any particular test or to use any particular

---

[3] The Tribe argues that 36 C.F.R. § 215.3(d) requires public comment on any revisions to an EA (Doc. 45 at 13), but this regulation does not exist.

method, so long as the evidence provided to support its conclusions, along with other materials in the record, ensure that the agency made no clear error of judgment that would render its action arbitrary and capricious." *Bark v. U.S. Bureau of Land Mgmt.*, 643 F. Supp. 2d 1214, 1223 (D. Or. 2009) (alterations incorporated, quotation marks and citation omitted). Courts should defer to the agency's expertise in this area and consider only whether the EA "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences[.]" *Ass'n of Pub. Agency Customers*, 126 F.3d at 1183.

Plaintiffs point to no requirement that the EA specifically quantify or model the effects of the Baseline Project on ozone levels, and several cases have found that an agency acts reasonably when, as here, it focuses on ozone precursors. In *Border Power Plant Working Group v. Department of Energy*, the court found that an agency had acted reasonably when it "provide[d] a logical argument that the presence of [nitrogen oxides] and ozone will be closely and positively correlated[,]" and then analyzed the nitrogen oxides contributions that would be made by the action at issue and "reasonably extrapolated from this the impact on ozone." 260 F. Supp. 2d 997, 1022 (S.D. Cal. 2003); *see also Amigos Bravos v. U.S. Bureau of Land Mgmt.*, No. 6:09-CV-00037-RB-LFG, 2011 WL 7701433, at *33 (D.N.M. Aug. 3, 2011) (finding that the agency adequately identified the environmental risks of the proposed action when it calculated the ozone precursor emissions for the proposed action and determined that the development would contribute to an increase in emissions and could contribute to violations of the ozone NAAQS); *Nat. Res. Def. Council v. Vilsack*, No. 08-CV-02371-CMA, 2011 WL 3471011, at *9 (D. Colo. Aug. 5, 2011) (finding that the agency did not violate NEPA when it conducted modeling of ozone precursors).

Here, the Forest Service divided the Baseline Project into three segments: (1) construction and initial activities during the first year, (2) monthly well monitoring during the second year, and (3) quarterly well monitoring during the third through tenth years. A.R. 15321. The EA includes data on the estimated emissions of various

contaminants during the first year of the Baseline Project – the year that will result in the highest emissions. A.R. 15321-22. The EA notes that some of these contaminants are ozone precursors, but that the temporary nature of the project and the low levels of emissions will likely lead to "no measurable increases in ozone levels." A.R. 15322.

As part of this analysis, the Forest Service commissioned a 20-page Air Emission Inventory by Pinyon Environmental. A.R. 13418-37. That document sets forth estimated emissions from the Baseline Project, including nitrogen oxides. It also discusses the context and cumulative impacts of the project. *Id.* It finds that nitrogen oxides emissions during the first year will constitute only 1% of all nitrogen oxides emissions from Pinal County, even if only the major emission sectors are considered. A.R. 13433-34. When all sources are consider, nitrogen oxides emissions from the Baseline Project will constitute less than 1% of emissions in Pinal County. *Id.*

The Court finds this a sufficient consideration of the project's effects on ozone. The Forest Service found that ozone modeling would not be "appropriate for the scale of analysis due to the relatively low levels of ozone precursors estimated to be generated by the project and exorbitant cost and inconclusive results that would result from modelling." A.R. 17216. "Defendants' conclusion that ozone modeling was inappropriate for this Project based on its complexity and cost is entitled to deference." *Nat. Res. Def. Council*, 2011 WL 3471011 at \*9.

### b. Air Quality Standards.

Plaintiffs argue that Defendants did not consider all of the relevant factors when analyzing the Baseline Project's impact on ozone because it considered outdated National Ambient Air Quality Standards ("NAAQS"). Doc. 38 at 22. As both parties agree and the administrative record reflects, the NAAQS for ozone were lowered from 75 parts per billion ("ppb") to 70 ppb. A.R. 17217; Doc. 38 at 22; Doc. 41 at 41. This change was published on October 26, 2015, and went into effect on December 28, 2015. 80 Fed. Reg. 65291-65468. States and tribes were then required to work with the federal government to implement the new standards, making recommendations for designation

areas and reviewing their capacities to meet the standards, among other things. 80 Fed. Reg. 65435.

The Forest Service considered the previous NAAQS for ozone – 75 ppb – and found in the EA that ozone in the relevant monitoring area "was measured at concentrations that exceeded the 2008 8-hour zone NAAQS on 25 days between 2008 and 2013." A.R. 15322. Ozone concentrations were measured slightly above the standard in 2008, 2011, and 2012, and slightly below the standard in 2009, 2010, and 2013. *Id.* Noting that these measurements nonetheless resulted in the area being designated as "in attainment," the Forest Service further emphasized the "temporary nature of construction-related emissions in the first year of the project during which the majority of the air emissions would be expected to occur," and concluded that "no measurable increases in area ozone levels are likely." *Id.*

The final EA was issued in January 2016, immediately after the new NAAQS went into effect. The Forest Service's Objection Review, compiled in response to objections from Plaintiffs and others, addressed the new standards:

> the NAAQS for ozone has been lowered since this EA was written from 75 ppb to 70 ppb. A quick analysis of the data presented in the EA as well as more current air quality data from the Queen monitoring station indicate that it is highly likely that this area will become a non-attainment area for the 8-hr Ozone NAAQS when new designations are determined in 2017. The 4 highest value [sic] for ozone at the Queen monitor was 68 ppb and 74 ppb in 2014 and 2015 respectively. The 4th highest value for the 8-hr Ozone NAAQS will have to be 67 ppb or less for the area to achieve the standard in 2017, a value that hasn't been achieved since at least 2008. . . . Being designated as a non-attainment area will affect any projects on the forest in that area that could produce ozone precursors. Since mitigations have already been included, this may be insignificant[.]

A.R. 17217.

After a detailed inquiry that will be described below, the EA reasonably found that "no measurable increases in area ozone levels [caused by the Baseline Project] are likely." A.R. 15322. If the project is unlikely to produce measurable increases in ozone,

as the EA found, this is true under the new NAAQS as well as the old.  The project will have a "minimal and temporary" impact.  A.R. 15323.

In addition, as the Objection Review notes, the EA implemented mitigation measures when assessing the Baseline Project's impact on ozone levels.  Specifically, "the use of mobile and portable construction equipment with recently manufactured diesel engines and the use of ultra-low sulfur diesel as fuel will minimize nitrogen oxides, carbon monoxide and sulfur dioxide emissions," which are precursors to ozone.  A.R. 15323.

Furthermore, Plaintiffs cite no authority which states that the Forest Service must analyze ozone levels using the NAAQS in effect at the time the EA is issued.  The new NAAQS were not published until October 26, 2015, and went into effect on December 28, 2015.  The 127-page EA analyzing the Baseline Project's impact on a variety of resources was commenced long before the new NAAQS were published.  As the District of Columbia Circuit found, an agency acts reasonably when it assesses "air quality impacts likely to occur based on the regime with which it was faced" when conducting the analysis.  *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006).  "[R]eassessments must end at some point, or NEPA simply becomes a tool to stall new projects indefinitely, rendering agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."  *Id.* (citation and internal quotations omitted).[4]  Moreover, if, as the Objection Review indicates, the relevant area is likely to be designated as nonattainment because the NAAQS have been lowered, the Baseline Project itself would not be the action that "push[ed] the area into nonattainment."  *TOMAC*, 433 F.3d at 863 (citing 40 C.F.R. § 1508.28(b)(10)).

_____

[4] *TOMAC* dealt with a situation where a county was given a nonattainment designation *after* the EA was released.  If the new NAAQS levels for ozone result in the area of the Baseline Project being a nonattainment area, it too will occur after the EA was issued.  Counsel stated at oral argument that the State of Arizona has not recommended that the project area be designated a nonattainment area, but the record contains no evidence on that point.

- 19 -

The Forest Service reviewed ozone measures in the relevant area for the period of 2008 to 2013, the current attainment designation of the area, the possibility of nonattainment in the future, mitigation measures to minimize the emission of ozone precursors, and the temporary and minimal nature of any emissions of ozone precursors from the Baseline Project. This analysis is thorough and reasonable. The Court cannot conclude that the change in the NAAQS renders it arbitrary and capricious.

### c. Cumulative Air Impacts.

Plaintiffs take issue with the Forest Service's analysis of the Baseline Project's cumulative impact on air quality. They argue that the EA contains less than a page of analysis on this issue, does not mention cumulative impact on ozone levels, and does not consider emissions from nearby projects, including the Main Mine. Doc. 38 at 23. This is an unfair description of the EA's air quality analysis.

Agencies must "take a hard look at all actions that may combine with the action under consideration to affect the environment." *Great Basin Res. Watch*, 844 F.3d at 1104 (quotation marks, emphasis, and alterations omitted). Agencies must provide "useful analysis" including "quantified or detailed information" of how past, present and future projects will combine with the proposed project to impact the environment. *Great Basin Mine Watch*, 456 F.3d at 971-72 (citations and quotation marks omitted). "[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998)). "The cumulative impact analysis must be more than perfunctory; it must provide a 'useful analysis of the cumulative impacts of past, present, and future projects.'" *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.,* 177 F.3d 800, 810 (9th Cir. 1999)).

1    But we should not forget the purpose of the cumulative impact analysis.  As the

2    relevant regulation explains: "Cumulative impact is the impact on the environment which

3    results from the incremental impact *of the action* when added to other past, present, and

4    reasonably foreseeable future actions regardless of what agency (Federal or non-Federal)

5    or person undertakes such other actions."  40 C.F.R. § 1508.7 (emphasis added).  The

6    focus is on "the action" under consideration.  Cumulative impact analysis is a tool to

7    determine whether the action in question – in this case, the Baseline Project – should be

8    approved.  The question is whether that action, when added to the cumulative effects of

9    other relevant actions, will have a significant impact on the environment.

10       The final EA correctly notes that "[c]umulative effects are assessed in terms of

11   how the impacts from the [Baseline Project] would add to impacts of other past, present,

12   and reasonably foreseeable future actions."  A.R. 15230.  The EA also quotes this

13   relevant language from an EPA guidance document on reviewing cumulative impacts:

14   "small scale projects that have minimal impacts that are of short-duration would not

15   likely contribute significantly to cumulative impacts."  *Id.* (quoting U.S. Environmental

16   Protection Agency, May 1999, *Consideration of Cumulative Impacts in EPA Review of*

17   *NEPA Documents*).  Throughout its cumulative impacts analysis, the EA maintains its

18   focus on the Baseline Project and the question of whether the effects of that project, when

19   added to the effects of other relevant projects, will significantly impact the environment.

20   This is an example from the soil resources discussion in the EA:

21       Potential impacts from the Proposed Action to soil resources have been
22       determined to be negligible.  Therefore, there are no project-related impacts
         to be added to any present or reasonably foreseeable future actions,
23       including Resolution's proposed [Main Mine], which would contribute to
24       cumulative impacts.  Subsequently, no significant cumulative effects to soil
         resources are anticipated.
25

26   A.R. 15256.

27

28

- 21 -

With this background, the Court will consider the final EA's cumulative impact analysis for air quality. To do so, the Court must look not only to the specific section title "Cumulative Effects" (A.R. 15323), but to the broader analysis contained in the EA. *See Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1009 (9th Cir. 2011) (looking to other parts of EA to judge the sufficiency of its cumulative effects analysis).

The EA recognizes that the air quality effects of the Baseline Project will vary over time. The effects will be greatest in the first year or so when construction and drilling equipment is mobilized to drill the wells and dig the test trenches. A.R. 15208, 15322. The EA lists the emissions-generating equipment that will be used during this phase. A.R. 15209 (Table 2-2). This includes, for example, two groundwater-well drilling rigs and related equipment, a tracked drilling rig for the geotechnical cores, an excavator and bulldozer for the test trenches, and a road grader, front-end loader, and water truck for road improvements. *Id.* This equipment will be in operation only during the first year or so of the project.

In its discussion of air quality, the EA notes that the Arizona Department of Environmental Quality ("ADEQ") has jurisdiction over the work area. A.R. 15317. It then discusses ADEQ's air-quality rules with respect to the kinds of construction-related equipment that will be used during the first year. "Air quality regulations implemented by ADEQ include provisions applicable to construction projects which are considered 'temporary sources.'" A.R. 15318. Installation of wells "is specifically included under the definition of *insignificant activity* as 'miscellaneous activities' in AAC Section R18-2-101.68g." *Id.* (emphasis added). The EA then observes:

> The applicability of these two definitions means that the planned drilling activities, which would result in the installation of groundwater testing and monitoring sites, are not subject to stationary source air permitting requirements under the ADEQ rules. It should be noted that items of equipment (specifically generators and equipment engines) used during construction activities are not subject to either the Federal New Source

Performance Standards or the regulations promulgated pursuant to the [Clean Air Act].

A.R. 15318. The import of this discussion is that existing regulations recognize the temporary and generally insignificant impacts on air quality of construction activities like those proposed for the first year of the Baseline Project.

The EA then proceeds to quantify in considerable detail the air and dust emissions to be generated during the first year. *See* A.R. 15321-22 (Tables 3-13 to 3-18). These calculations were made in an Air Emission Inventory prepared by Pinyon Environmental, Inc., and reviewed by Forest Service personnel. A.R. 13418-37. The inventory used a "worst-case scenario," calculating construction-related emissions at the highest levels reasonably possible. A.R. 13423. It notes that "[e]mission on most days are projected to be substantially lower than this value." *Id.* Using this worst-case assumption, total air emissions during the year of construction are set forth in Table 3-18. They include 102.5 tons of nitrogen oxides, 26.7 tons of carbon monoxide, 6.5 tons of sulfur dioxide, 8.6 tons of volatile organic compounds, 81.5 tons of dust less than 10 microns in diameter, and 14.6 tons of dust less than 2.5 microns in diameter. A.R. 15322.

The Air Emissions Inventory compares these projected emissions to existing air quality in the Baseline Project area. As nitrogen oxides (an ozone precursor) and dust levels (particulates) are predicted to be the highest forms of emissions from the project, the inventory looks to the levels of these airborne contaminants in Pinal County:

> According to the USEPA, [nitrogen oxides] emissions from the two largest sectors for this pollutant, highway and off-highway vehicle exhaust, totaled 11,148 tons in 2011 (the latest year for which figures are available). [Particulates less than 10 microns in diameter] from the five largest sectors (agriculture, construction, paved and unpaved roads, and mining) totaled 35,226 tons. [Particulates less than 2.5 microns] from the five largest sectors for this pollutant (highway vehicles, off-highway vehicles, waste disposal & recycling, other industrial processes, and miscellaneous) totaled 6,265 tons (USEPA, 2014). The estimated emissions of [these substances] from the Project account for approximately 1%, 0.2%, and 0.2%, respectively, of the figures cited above, which represent only the major

emission sectors for each pollutant, and do not include all such emissions from Pinal County.

A.R. 13433-34. Thus, the most substantial air emissions from the Baseline Project are minimal. They will be 1% or less of emissions in the county from a few of the largest sources, and even less when all sources are considered. And this is true even though the project's emissions were estimated using a worst-case scenario. A.R. 13423.

With the project emissions calculated, the EA explains the methodology used to evaluate air quality impacts. "As the predicted emissions associated with the Proposed Action are minimal, construction-related emissions occurring during construction and initial activities are analyzed in this EA. Construction-related emissions are categorized as temporary; therefore, any corresponding effects would be considered either temporary or short-term." A.R. 15320. In other words, the focus of the EA is primarily on the emissions generated from the construction activities of the first year, and even these are minimal and temporary.[5] The EA then provides this explanation of its methodology:

> The intensity of air emissions associated with project-related construction activities are not subject to permitting under applicable air quality regulations, with the exception of dust control permitting and controls applicable to operation of certain types of construction equipment. *For the purpose of this air quality analysis, any potential effects from construction-related air emissions are considered in the context of existing air quality conditions in the project area.*

*Id.* (emphasis added). In other words, given the minimal, temporary, and unregulated nature of the first-year emissions, the EA will assess their impact by comparing them to existing air quality levels.

To identify existing air quality conditions in the project area, the EA looks to ADEQ's Queen Valley air monitoring site, located approximately 1.5 miles west of the

---

[5] Emissions in later years will be truly minor, consisting of two persons driving a truck to groundwater wells once a month in the second year and once a quarter in years three through ten. A.R. 15321 ("Emissions associated with monthly and quarterly well monitoring in years two through ten include vehicle exhaust and fugitive dust from road travel generated by vehicles traveling to the monitoring sites for personnel to collect data.").

- 24 -

project area. A.R. 15319. The EA sets forth ozone and particulate data for the years 2008-2013, the most recent five-year period for which data was available. A.R. 15319 (Table 3-12). The EA concludes that ozone levels have been slightly above federal guidelines (NAAQS) in 2008, 2011, and 2012, and slightly below guidelines in 2009, 2010, and 2013. "Although ozone concentrations at the monitoring station have periodically exceeded the standard, the area is classified as attaining the standard." *Id.* The EA also notes that particulates "measured at the Queen Valley monitoring site have been well below the applicable NAAQS limits." *Id.*

Considering all of this information, the EA reaches this conclusion: "Based upon the temporary nature of construction-related emissions in the first year of the project during which the majority of air emissions would be expected to occur, and the attainment status for ozone in the project area, no measurable increases in area ozone levels are likely." A.R. 15322.

The EA then turns to the cumulative effects analysis. In an earlier cumulative effects section, the EA identified all projects in the area that could have cumulative effects. These are set forth in Table 3-1. *See* A.R. 15234-36. Under the heading "mineral development," the table includes the four mining-related projects identified by Plaintiffs as having been omitted from the air quality cumulative effects analysis: Omya Inc.'s Superior Limestone Quarry, Imerys Perlite Mine, the Copper King proposed mineral exploration project, and the Red Top mineral exploration project. A.R. 15235.

In the cumulative effects section of the air quality analysis, the EA notes that "[s]everal of the present and reasonably foreseeable future actions outlined in Table 3-1, including vegetation management, range, *mineral development*, and transportation and access could contribute to cumulative effects on air quality." A.R. 15323 (emphasis added). It specifically notes that "[c]ontinued mining of the Perlite Mine could contribute to longer-term effects," and that "[c]onstruction and operation of Resolution's proposed [Main Mine] could also contribute long-term effects." *Id.* These possible effects notwithstanding, the EA concludes:

Cumulative effects to air quality from the Proposed Action would result in a temporary, localized increase in emissions. However, fugitive dust and emissions would be controlled by dust controls and emission controls. For these reasons, the incremental effects to air quality from the Proposed Action when considered with the effects of past, present and reasonably foreseeable future actions would be minimal and temporary.

*Id.*

The Court does not find this conclusion to be arbitrary or capricious. After detailed analysis, the EA concludes that the Baseline Project will have a minimal and temporary effect on air quality. Given this minimal effect, the Court cannot conclude that the Forest Service should have attempted to quantify emissions from the other mineral development projects as Plaintiffs contend. Regardless of the emissions from those other projects, the Baseline Project's contribution would still be negligible and temporary. As the Ninth Circuit explained in a similar situation: "Because the FSEIS concludes that the channel deepening project will have virtually no effect on salinity, detailed cataloguing of past projects' impact on salinity would not have 'informed analysis about alternatives presented for the current project,' and was unnecessary." *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1140 (9th Cir. 2006).

The Court acknowledges Ninth Circuit cases which have stated that "[i]n a cumulative impact analysis, an agency must take a 'hard look' at all actions. An EA's analysis of cumulative impacts 'must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.'" *Te-Moak*, 608 F.3d at 603 (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005)); *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016). But in addition to the *Northwest Environmental Advocates* case discussed above, the Ninth Circuit has said that "[a]n agency may . . . characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area." *Ctr. for Envtl. Law & Policy*, 655 F.3d at 1007; *see also N. Plains Res.*

*Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011) ("Federal agencies may 'aggregate [ ] cumulative effects analysis' for NEPA purposes."). The unique facts of the case matter. The EA must provide "useful analysis" including "quantified or detailed information" of how past, present and future projects will combine with the proposed project to impact the environment. *Great Basin Mine Watch*, 456 F.3d at 971-72.

Here, the EA undertakes a hard look and provides a useful analysis. It engages in a detailed analysis of the air quality effects of the Baseline Project and its impact in the area when compared to past air quality measurements by EPA and ADEQ. Because the proposed project will have only a minimal and temporary effect on air quality, the Forest Service reasonably concludes that it will not combine with past, present and future projects to have a significant effect on the environment. The Court finds this approach reasonable. Certainly, it is neither arbitrary nor capricious.

The EA includes this discussion of the Main Mine for purposes of cumulative effects on air quality:

> Although the location and types of air quality effects associated with the [Main Mine] are uncertain, effects of the [Main Mine] would not commence until year six (at the earliest) whereas the majority of the Proposed Action effects would be realized in the first two years. During the period when air quality effects of the Proposed Action overlap in time with the [Main Mine] (years six through ten); the incremental effects of the Proposed Action would be negligible.

A.R. 15323. The Court finds this conclusion to be reasonable. As noted above, the Baseline Project's effects on air quality in years six through ten will consist of nothing more than a truck driving to the groundwater monitoring wells once every three months – the equivalent of a family driving through the forest for a picnic or camping trip. It would make no sense, as Plaintiffs argue, to require a detailed quantification of the Main Mine's air quality effects (which will be done later in the EIS) simply to decide whether the amount contributed by these truck trips will significantly affect the environment.

In short, the EA's air quality analysis, including its review of cumulative impacts, is more than perfunctory. It is a "useful analysis" that reasonably evaluates the Baseline Project's effect on air quality when other sources are considered. *Kern*, 284 F.3d at 1075.

### 2. Remaining Cumulative Impact Analysis.

Plaintiffs argue that the EA's other cumulative impacts analyses are defective. The Court does not agree.

#### a. Scope of the Cumulative Impact Analysis.

Plaintiffs argue that the Forest Service improperly truncated the geographic and temporal scope of its review of the cumulative effects of the Baseline Project, the Main Mine Proposal, and other nearby projects. Doc. 38 at 26; Doc. 44 at 18, 22. They cite case law stating that an EA must "fully address cumulative environmental effects" to argue that the Forest Service improperly limited the scope of its evaluation. Doc. 44 at 18 (quoting *Te-Moak*, 608 F.3d at 602). Plaintiffs do not offer alternative limits for the Forest Service's analysis, but seem to argue that no geographic or temporal limits may be placed on the cumulative impact assessment. *Id.* at 24. They argue that cumulative impact analysis must cover "the periods of all 'reasonably foreseeable future' actions" and thus must examine the cumulative impact for the "combined period of both" the Baseline Project and Main Mine Proposal. *Id.* Such a conception would render the cumulative impact analysis requirement impossibly demanding. It would need to encompass the decades-long life of the Main Mine, even though the Baseline Project will last only ten years and will have truly minimal activity in years two through ten.

Cumulative impact analysis may be limited by geographic and temporal boundaries. As the Supreme Court has explained, "identification of the geographic area within which [cumulative environmental impacts] may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976). As the Ninth Circuit has recognized, determining appropriate boundaries "requires a complicated analysis of several factors, such as the scope of the project considered, the features of the land, and the types of species in the area." *Selkirk*

*Conservation All. V. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003). Because this task involves the "special competency of the appropriate agencies," deference will be given to agencies if they provide a reasoned justification for the scope of their cumulative effects analysis. *Id.* at 958, 960.

### i. Temporal Scope.

The Forest Service limited the temporal scope of its cumulative impacts analysis to a 12-year period, reasoning that the Baseline Project will last ten years and two additional years would incorporate any "potential residual impacts." A.R. 14825. To determine potential cumulative effects of the Main Mine, the Forest Service assumed that the Baseline Project and the NEPA permitting of the Main Mine Proposal would begin at approximately the same time, that the EIS and ROD for the Main Mine Proposal would be completed in five years (even though, the EA notes, it is likely to take longer), and that construction and mine development would take up to nine years. *Id.* The Forest Service further noted that copper production was scheduled to begin six to seven years after release of the ROD, and thus could fall within the last two years of the 12-year period identified for review of the Baseline Project's cumulative effects. *Id.* Based on this timeline, the Forest Service identified all facilities and activities that would overlap. *Id.* The Forest Service then calculated the number of acres that would be disturbed by each facility, and mapped the geographic overlap. A.R. 14825-36.

The Court does not find this temporal limit to be arbitrary or capricious. It covers all ten years of the Baseline Project plus two additional buffer years to capture any possible residual impacts. It recognizes that the Baseline Project will include its most extensive activities in the first year, and that years two through ten would consist only of periodic well sampling. There would be no sampling during the final two years when activities at the Main Mine might be starting.

"NEPA does not impose a requirement that the Forest Service analyze impacts for any particular length of time." *Selkirk*, 336 F.3d at 962. It only requires consideration of relevant factors and a rational connection between the facts found and the choice made.

*Id.*  In *Selkirk*, the Ninth Circuit upheld the Forest Service's decision to limit the temporal scope of an EIS to three years, despite the fact that the actions at issue would continue for at least five to ten years.  *Id.* at 952.

Plaintiffs' argument that the Forest Service should consider the entire life of the Main Mine essentially repeats their previous argument that the Main Mine is a connected action that must be considered in full with the Baseline Project in a single EIS.  But the Forest Service need only consider the incremental impact of the Baseline Project in relation to the Main Mine to determine if the Baseline Project will have a significant cumulative impact.  The 12-year temporal scope accomplishes that purpose.

Plaintiffs rely on an unpublished decision of this Court's Tucson division to argue that the cumulative impact analysis must include effects from projects that do not temporally overlap with the project to be approved.  Doc. 38 at 28 (citing *Defs. of Wildlife v. U.S. Forest* Serv., CV 14-02446-TUC-RM, Doc. 38-2).  The court in that case found that an agency erred by failing to consider the impact of a reasonably foreseeable project that would have similar environmental effects as the project to be approved, meaning that the two projects would result in a temporally and geographically broader environmental impact than either project in isolation.  Doc. 38-2 at 17.  The court's ultimate conclusion rested on its finding that the agency's determination that the two projects "will have no cumulative impacts because they will not temporally overlap [was] a post hoc rationalization unsupported by the information available[.]"  *Id.* at 18.  The EA in this case is distinguishable, as the Forest Service found that the Baseline Project and the Main Mine will overlap and considered their combined environmental impact during that period of overlap plus two additional years.  A.R. 14825; 15237.

## ii.  Geographic Scope.

Plaintiffs also attack the geographic scope of the EA's cumulative impact analysis, contending that the Forest Service improperly limited its review to the Baseline Project area and considered only areas of direct overlap between the project and other actions.  Doc. 44 at 25.  They argue that the Forest Service limited its analysis mostly to the north

of Highway 60, excluding the visual, noise, wildlife movement, air quality, and other impacts that will result from the Baseline Project on the highway's south side and outside the direct "project area." Doc. 38 at 29-30.

"[A]n agency has the discretion to determine the physical scope used for measuring environmental impacts," so long as its choice represents a reasoned decision and is not arbitrary. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); *see also Kleppe*, 427 U.S. at 414. To determine the geographic scope of an EA, "the agency must balance the need for a comprehensive analysis versus considerations of practicality, while also keeping in mind that use of a larger analysis area can dilute the apparent magnitude of environmental impacts." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014). Because an agency "has to draw a line somewhere," courts need only consider whether the agency "has offered a reasonable justification for why it drew the line where it did." *Id.* at 944.

In this case, the Forest Service considered the specific resource, ecosystem, and human community being affected. A.R. 15229. The boundaries were drawn to "prevent dilution of the cumulative effects over large areas." *Id.* The Forest Service began by considering the Baseline Project and its likely effects. *Id.* It then drew a line where the effects of the Baseline Project would become "non-measurable." A.R. 15230. This area is depicted in Figure 3-1 of the EA and covers 59,006 acres. A.R. 15232, 15230. It includes the Queen Creek watershed north of U.S. 60 as well as an area south of U.S. 60 that is part of the Oak Flat-Upper Queen Creek subwatershed. A.R. 15230. The Forest Service used this area to identify other actions which would have an impact on resources, leading to a cumulative impact. A.R. 15229. As already noted, these identified projects are listed in Table 3-1 of the EA, along with an explanation of their spatial relationship to the Baseline Project. A.R. 15234-36.

The Forest Service noted that the cumulative effects analysis area is slightly larger than the project area depicted in Figure 3-1 for analysis of two conditions: noise and climate change. A.R. 15230. This is because a 0.5-mile buffer around the project area is

needed to capture noise from the Baseline Project. *Id.* No noise would be detectable beyond the buffer. *Id.* Because "[c]limate change is not spatially bound," "cumulative effects would likely extend beyond the analysis area shown on Figure 3-1." *Id.*

Within the analysis sections for each specific resource, the EA discusses the geographic scope considered. For example, with regard to the cumulative impact on water resources, the Forest Service explained the characteristics of the analysis area, which it limited to the Superior Basin. A.R. 15239. It noted that "[g]roundwater effects from the [Baseline Project] would not extend into the southern Superior Basin (south of Queen Creek) due to the groundwater discharge zone present along Queen Creek." *Id.* It also explained that the Whitlow Ranch Dam would act effectively as the principal groundwater discharge point for the entire Superior Basin due to the low permeability of the surrounding rocks, and thus limited its analysis to the area upstream of the dam. A.R. 15240, 15251.

The Forest Service also detailed the effects the Baseline Project would have on soil and the area where those effects would occur (A.R. 15253), and explained that the scope of this cumulative impact would encompass "perennial and intermittent streams where effects from other past, present, and reasonably foreseeable actions could have impacts on soil resources." A.R. 15255. Similar explanations were given for the effects on vegetation and wildlife. A.R. 15264, 15266; A.R. 15281, 15286.

The Court finds these geographical limitations reasonable. Plaintiffs provide no persuasive reason to conclude otherwise. The Court will defer to the Forest Service's geographical scope.

### b.     Cumulative Impact Analysis of the Main Mine.

Plaintiffs argue that the Forest Service did not sufficiently consider the cumulative impacts of the Main Mine and thus did not engage in the required "hard look" under NEPA. Doc. 38 at 24. First, Plaintiffs seem to argue that the Forest Service declined to consider the cumulative impact of the Main Mine in the EA and instead deferred such

consideration to the EIS of the Main Mine. *Id.* But any such argument is clearly contradicted by the administrative record, even as cited by Plaintiffs.

While the EA notes that the Main Mine Proposal will be assessed in a subsequent EIS, it also emphasizes that alternatives to the proposal may be developed, rendering the characteristics and impact of the Main Mine "uncertain." A.R. 15237. Despite Plaintiffs' arguments to the contrary, this recognition of uncertainty concerning the Main Mine Proposal did not result in the Forest Service declining to consider its impact. Rather, the Forest Service considered the impact of the Main Mine as proposed with the information available. The EA states: "Although the geographical location, final configuration and schedule for [Main Mine] activities is uncertain, it is necessary to evaluate the potential overlap in time and space of the [Main Mine] and Baseline activities to facilitate cumulative effects analysis for the Baseline EA. To be conservative, the Forest Service has assumed that the facility location and configuration will be as proposed in the [Main Mine proposal.]" *Id.*

Plaintiffs next contend that the Forest Service failed to consider the most recent Main Mine Proposal in both the draft and final EA. Doc. 38 at 26. The first proposal was submitted in November 2013 and revised in September 2014. Correspondence from the Forest Service indicates that reference in the draft EA to the "November 2014" proposal was an unintentional writing error, meant to refer to the proposal finalized in September 2014. A.R. 10693. But even if the Forest Service considered the 2013 proposal, the 2014 version is in the administrative record (A.R. 10849) and Plaintiffs have not identified any meaningful difference between the two versions.

Plaintiffs argue that any assessment of the Main Mine's cumulative impact was conclusory and not supported by quantified analysis. Doc. 44 at 25. Again, the Court does not agree. As discussed above, the Main Mine will begin to have meaningful environmental effects, at the earliest, in years six through ten of the Baseline Project. During those years, the Baseline Project will consist of nothing more than quarterly sampling of groundwater monitoring wells. It would make no sense, as Plaintiffs argue,

to require a detailed quantification of the Main Mine's environmental effects simply to decide whether these quarterly truck trips would significantly affect the environment.

The EA quantifies the acres likely to be disturbed by the Main Mine, broken down by specific facilities and construction. A.R. 15256 (Table 3-2). The EA also addresses the cumulative impact of the Main Mine with regard to specific resources. For example, in assessing cumulative effects of the Main Mine on water resources also potentially affected by the Baseline Project, the EA notes that the Main Mine – although its contours and details are not yet known – may affect water quality by disturbing soil and native vegetation, and could increase sedimentation due to erosion. A.R. 15252. The EA notes that proposed shafts for the Main Mine would be on the east side of the Concentrator fault, which acts as a hydraulic barrier between the shafts and the groundwater system in the Baseline Project area. *Id.* This also means that dewatering of the shafts would not affect groundwater in the Baseline Project area. *Id.*

The EA notes that the Main Mine could result in milling of copper ore and the establishment of a tailings facility in the Baseline Project area, but states that the impacts of the Main Mine Proposal will be addressed in more detail in the EIS to be performed for the Main Mine. *Id.* Plaintiffs contend that this is an inappropriate postponement of the cumulative effects analysis, but the reality is that the Main Mine EIS will be a much more comprehensive look at the Main Mine Proposal, informed in part by the data to be generated by the Baseline Project. The Court cannot conclude, as Plaintiffs seem to suggest, that the environmental propriety of the data-gathering project must include a full-blown analysis of the major copper mine that may later be built in the area. The purpose of the EA is to assess the effects of the Baseline Project. The cumulative effects analysis is designed to determine whether the cumulative effect created by that project will result in significant environmental consequences that the project alone would not produce. The Court finds that the EA has done that reasonably. The Court cannot agree that the cumulative effects of the data gathering can only be measured after a full-scale analysis of the mine it is intended to support.

Other portions of the EA include similar cumulative effects analyses. The soil resources section quantifies the acreage of soil to be disturbed by the Main Mine and other projects. A.R. 15256 (Table 3-2). The EA finds that some 918 acres could be disturbed by these activities. *Id.* The EA includes figures showing soil disturbance areas for year ten of the Baseline Project operation and year two of the Main Mine operation. A.R. 15258-60 (Figures 3-5, 3-6). The EA concludes that the effects of the Main Mine disturbance, considered with other projects in the area including the Baseline Project, would be negligible in the approximately 92 square miles of the cumulative effects area. A.R. 15256, 15230.

The EA contains similar considerations of the Main Mine in the cumulative effects analysis on wildlife (A.R. 15286-87), air (A.R. 15323), recreation (A.R. 15307-08), vegetation (A.R. 15266-68 (including Figure 3-7)), invasive species (A.R. 15272-73), and wildlife and special status species (A.R. 15286-87). The Court finds this treatment of the Main Mine's effects, although clearly less comprehensive than will be included in the EIS, sufficient to evaluate the cumulative impact of the Baseline Project.

The Ninth Circuit has held that EAs of smaller-scale operations can defer to a coming EIS for a larger project. In *Center for Environmental Law*, the court held that an agency's EA of a drawdown project did not violate NEPA when it failed to consider the cumulative impact of a reasonably foreseeable action, the Special Study, because the agency had committed to reviewing the Special Study in a subsequent EIS. 655 F.3d at 1010. The Ninth Circuit explained:

> By issuing the notice of intent to prepare an EIS for the Special Study, the government impliedly promised to consider the cumulative effects of the special study with the drawdown project in that EIS. In fact, Reclamation *expressly* made the same promise to this court, stating in its opening brief that "there is no danger that [actions taken as a result of the Special Study] would escape NEPA review." The import of the government's promises is that Reclamation will prepare a "document [that] explores the collective impact of" the drawdown project and the Special Study. *See Blackwood,* 161 F.3d at 1215 (rejecting a cumulative effects analysis because no such document was in the offing). As a result, CELP cannot argue that

Reclamation is attempting to initiate multiple drawdowns from Lake Roosevelt "without ever having to evaluate the . . . cumulative environmental impacts" of those actions. *Native Ecosys. Council v. Dombeck,* 304 F.3d 886, 897 (9th Cir.2002).

*Id.* at 1010-11 (emphasis in original). The Ninth Circuit went on to emphasize that the Special Study would have a much more significant environmental impact than the drawdown project, and thus to require an account of "the cumulative effects of the drawdown project and the Special Study in the drawdown project EA would [] be to direct the agency to wag the dog by its tail." *Id.* at 1011.

Plaintiffs do not dispute that the Forest Service will complete an EIS of the Main Mine Proposal. And, like *Center for Environmental Law*, the Baseline Project will have a much smaller impact than the Main Mine. A full and detailed assessment of the Main Mine will be contained in the EIS. Where the Forest Service has found the direct and indirect impact of the Baseline Project to be minimal, the cumulative impact of the two projects will be more properly assessed in the EIS of the Main Mine. The Forest Service has not entirely omitted any assessment of the Main Mine, as in *Center for Environmental Law*, but has made a reasoned assessment based on careful analysis.

### c. Cumulative Impacts of Other Projects.

Plaintiffs argue that the Forest Service failed to consider with adequate detail the cumulative impacts from other activities in the project area. Doc. 38 at 28. Plaintiffs contend that the "EA contains only the mere listing of projects and potential impacts without any of the analysis or detail required by NEPA to allow the public to understand the nature or extent of that impact." *Id*. at 32.

The Forest Service explained the temporal and geographic boundaries of its cumulative impact analysis and then provided a table identifying all actions which would fall within those boundaries. A.R. 15234-36. Table 3-1 provides a description of each action and its spatial relationship to the Baseline Project, and identifies the resources that each action might affect. *Id.* The Forest Service then provides a cumulative impact analysis section specific to each resource, as discussed above with respect to the Main

Mine. Plaintiffs contend that these sections provide conclusory and repetitive statements of no significant impact, rather than detailed and quantitative analysis. The Court does not agree, and will discuss the Forest Service's cumulative impact analysis for three resources: water, soil, and wildlife. The cumulative impact analysis of these three resources is representative of the agency's analysis regarding other resources.

With regard to water resources, the EA notes that vegetation management, range, mineral development, and transportation from other activities are likely to have an impact in combination with the Baseline Project. A.R. 15252. The EA then proceeds to discuss individual actions, noting that the Mesa Vegetation Regeneration and Habitat Improvement Project will re-vegetate approximately 30 acres in the project area along heavily used forest roads, and that this will stabilize previously disturbed areas and provide a positive effect to surface water quality by reducing erosion and runoff. *Id.* The EA also notes that mitigation efforts to be taken by the Forest Service to limit motor vehicle use to designated areas could help avoid landscape degradation and reduce erosion. *Id.* The EA explains that the Main Mine, the OMYA Superior Limestone Quarry, Imerys Perlite Mine, and proposed Copper King and Red Top projects could result in a greater degree of water quality effects than the Baseline Project. *Id.* These projects would likely disturb soil, causing erosion and increased sedimentation to surface waters. *Id.* The EA explains how several effects from these projects, mainly the Main Mine, would be limited by various regulations, maintenance efforts, and geographic characteristics of the area. A.R. 15352-53. Because of the temporary nature of the Baseline Project's use of access roads in the area and the minimal surface disturbance it would cause, the EA concludes that any incremental impact from the Baseline Project would not be significant. *Id.* It emphasizes that any disturbance from the 10-year Baseline Project would be reclaimed and vegetation would regenerate. *Id.* Finally, the EA emphasizes that the Baseline Project is intended "to characterize hydrologic conditions and water quality in the project area, not to exploit or diminish water resources." A.R. 15253.

With regard to soil resources, the EA sets forth the number of acres likely to be disturbed by the Main Mine. A.R. 15256. It also notes that the OMYA Quarry, Imerys Mine, and Copper King and Red Top projects could result in a greater impact to the project area than the Baseline Project. *Id.* The EA notes that the Baseline Project would contribute to cumulative soil resource effects such as soil compaction and erosion, but that other reasonably foreseeable actions would minimize or offset most of this impact. A.R. 15255. For example, user-created roads and trails along forest roads would be closed, and the vegetation would be restored. *Id.* This would stabilize previously disturbed areas. *Id.* The EA again emphasizes that road maintenance and post-project reclamation and regeneration would minimize any incremental impact from the Baseline Project, resulting in an insignificant cumulative effect. A.R. 15256.

With respect to wildlife, the EA notes that other identified projects may have an effect through vegetation management, mineral development, transportation and access, and safety hazard remediation projects. A.R. 15286. The EA notes that while there are likely to be effects to wildlife and special status species from identified reasonably foreseeable future actions, there is little likelihood that the Baseline Project would measurably add to those effects. Because motorized use associated with the Baseline Project would be "minimal, short-term, and widely dispersed," the EA concludes that any incremental impact would be insignificant. A.R. 15287.

These discussions adequately enumerate and assess the impacts of past, present, and reasonably foreseeable projects in the area. The agency has considered the interaction of multiple activities on relevant resources and made a reasoned assessment of the cumulative impact of the Baseline Project. Plaintiffs have made much of the Ninth Circuit's pronouncement that "calculation of the total number of acres to be [impacted by other projects] in the watershed is a necessary component of a cumulative effects analysis, but it is not a sufficient description of the actual environmental effects[.]" *Great Basin Mine Watch*, 456 F.3d at 973. The Forest Service calculates the number of acres likely to be impacted by the Baseline Project and related actions, but this is not the extent

of its analysis. The EA discusses the likely impact of these actions on various resources and how this impact is likely to be mitigated. And while much of this additional analysis is qualitative rather than quantitative, Plaintiffs do not explain what additional quantitative information could or should have been included in the EA's assessment.

Plaintiffs further argue that the EA's failure to independently assess the Copper King and Red Top projects will be exacerbated by the agency's decision not to conduct EAs for these projects. The Forest Service determined that these projects "may be categorically excluded from documentation in an environmental assessment or an environmental impact statement as a category of activity that allows short term (one year or less) mineral investigations and incidental support activities, such as authorizing a plan for exploration which uses existing roads, cross-country travel by vehicles and equipment, and clearing vegetation for drill pads (36 CFR 220.6(e)(8))." A.R. 9542. As the Forest Service notes, this category exists because projects which fall into it "normally do not individually or cumulatively have a significant effect on the quality of human environment." *Id.* Considering that these projects have already been found unlikely to have a significant cumulative impact and that the Forest Service did in fact consider these projects in the EA, the Court does not find the Forest Service's analysis inadequate.

Plaintiffs argue that the Forest Service failed to consider the cumulative impact of the nearby Superior West exploration project, which was first proposed to the Forest Service on October 14, 2015. Doc. 38 at 30. It is undisputed, however, that the Superior West project was modified before issuance of the final EA, and that the modified project included no activities within the geographic scope of the cumulative impact analysis. Doc. 41 at 49; Doc. 44 at 29. Plaintiffs provide no logical reason that a project outside the possible area of influence for the Baseline Project should be included in an analysis of the cumulative effects of the Baseline Project. Because the Court will defer to the Forest Service's reasonable determination of the scope of the EA of the Baseline Project, the Superior West project, based on its then-planned location, fell outside that reasonable scope. *See Friends of the Wild Swan*, 767 F.3d at 944.

As noted earlier in this order, on June 29, 2017, the Forest Service filed a Notice of New Information explaining that further changes have been made to the Superior West Project. Doc. 50. The notice attaches a Supplemental Information Report ("SIR") as required by the Forest Service Handbook. Doc. 50-1 at 2. The SIR explains that "[t]he Superior West project proposal, as modified in 2017, includes up to ten possible drill sites in the area assessed in the Baseline project for cumulative effects analysis." *Id.* at 4. It notes that the total area that could be affected by these ten wells is 2.21 acres, and that they will require one road improvement and one overland route. *Id.* at 4. The Forest Service will prepare an EA for the Superior West project. *Id.* at 3.

The SIR provides a cumulative effects analysis of the Superior West project for each of the categories included in the EA. *Id.* at 4-13. This analysis concludes not only that the effects of the Superior West project will be limited, but also that they will not overlap with any significant activities of the Baseline Project. *Id.* As a result, the SIR finds no significant cumulative effects. The Court finds this conclusion reasonable.

### d. Tribe's Arguments.

The Tribe joins the arguments of the other plaintiffs and makes several additional arguments. The Tribe implies that the Forest Service erred by not considering the impact of the Baseline Project on sites with important historical and cultural significance, but the Tribe does not identify any such sites.

The Tribe argues that the Forest Service did not adequately consider the cumulative impact of the Baseline Project, the Main Mine, and other actions on sites of cultural and historic importance. Doc. 39 at 12. The only explanation of this argument is the Tribe's assertion that "a full cumulative impacts analysis would have led to the conclusion that traditional cultural resources in the Project area would be buried under over 500 feet and 1.5 billion tons of tailings." *Id.* at 12-13. But this argument relates solely to the impact of the Main Mine and the TSF, and those proposals are not the subject of the EA. The Tribe has not shown that the ten-year data gathering of the Baseline Project will add cumulatively to the tailings that will be produced in coming

1   decades if the Main Mine and TSF are approved. The impact of the tailings will be
2   considered in the EIS that, unlike this EA, will embrace the full life of the mine.

3       The EA and administrative record reflect that the Forest Service considered the
4   impact of the Baseline Project on historical and cultural resources. The EA identifies 32
5   sites determined or considered eligible for the National Register of Historic Places
6   ("NRHP"). A.R. 15297 (Table 3-8). These sites were identified through two surveys of
7   cultural resources conducted in 2014, and another conducted in 2015. A.R. 15296-97.
8   The EA notes that "three archeological sites would be disturbed by the drilling or test
9   trenching, two sites would be disturbed by use of short-term temporary access roads, and
10  three sites would be disturbed by improvement of existing roads that would be used for
11  access." A.R. 15298. To address these concerns, "Resolution subsequently modified the
12  Plan to avoid direct effects to those eight sites." *Id.*

13      The EA also notes that Tribal consultations were conducted to evaluate potential
14  effects on cultural resources. A.R. 15299. Based on those consultations, the Forest
15  Service developed three mitigation measures: MM-13, which resulted in geotechnical
16  borings GT-9, GT-10, GT-11 (and the associated temporary access roads) not being
17  approved; MM-14, which resulted in geotechnical boring GT-31 being moved 675 feet;
18  and MM-15, which resulted in groundwater monitoring well DS-B being moved 80 feet.
19  *Id.* The EA concludes that these mitigation measures will "be effective in protecting the
20  traditional cultural resources[.]" *Id.*

21      The Tribe does not contend that this conclusion was reached in error, only that the
22  full impact of the Main Mine was not adequately considered. As discussed above, a
23  requirement for such detailed analysis of the Main Mine would dwarf any analysis of the
24  Baseline Project and would not further the purposes of NEPA. The Main Mine EIS will
25  have a broader scope that will address the concerns raised by the Tribe.

26      **D.    Analysis of Baseline Conditions.**

27      Plaintiffs argue that the Forest Service did not sufficiently establish baseline data
28  for the EA and thus did not consider all relevant factors before determining that the

Baseline Project would have no significant impact.  Doc. 38 at 33.  Plaintiffs appear to allege this deficiency with regard to multiple resources, but make arguments only with respect to baseline data for water resources.  *Id.* at 33-36.

While an EA or an EIS should "describe the environment of the area(s) to be affected" by the considered action, the "descriptions shall be no longer than is necessary to understand the effects[.] . . .  Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced."  40 C.F.R. § 1502.15; *accord.* 40 C.F.R. § 1502.2 ("Impacts shall be discussed in proportion to their significance.  There shall be only brief discussion of other than significant issues.  As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.").  Plaintiffs argue that the EA admits the Baseline Project will have an adverse impact on ground and surface water.  Doc. 38 at 34.  But a review of the EA shows that the Forest Service found that drilling of groundwater monitoring wells and other data-gathering activities in the Baseline Project present only a "limited potential impact to groundwater" and surface water.  A.R. 15248, 15250-51.

The Forest Service explained how this limited impact could occur, and also explained how it could be minimized.  *See, e.g.*, A.R. 15248 (noting that borehole drilling from the Baseline Project has the potential to affect water quality in the groundwater system if the deeper formations contain poor quality water, but noting that this could be limited by installing at least 20 feet of surface casing and grouting the borehole annular space); A.R. 15250-51 (describing erosion control features and reclaiming efforts that will minimize any impact of the Baseline Project on surface water quality).  Because the Forest Service found that the Baseline Project could potentially have only a limited impact on water quality in the area, the corresponding analysis and description of the environment in the EA may likewise be limited.  40 C.F.R. §§ 1502.15, 1502.2.

Plaintiffs argue that baseline data is a fundamental requirement of the NEPA process and is required in all EAs and EISs.  Doc. 38 at 33.  Baseline conditions are

necessary to "determine what effect the project will have on the environment" and thus to comply with the requirements of NEPA. *Great Basin Res. Watch*, 844 F.3d at 1101. The "establishment of a 'baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action.'" *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) (citation omitted). Thus whether baseline data is sufficient must be considered in practical terms and in the context of the specific project being evaluated. Applying this case-specific analysis, the Ninth Circuit has made clear that "[a]n agency need not conduct measurements of actual baseline conditions in every situation – it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch*, 844 F.3d at 1101; *Or. Nat. Desert Ass'n*, 840 F.3d at 569-70.

As already noted, the EA concludes that the project will pose "limited potential to impact groundwater quality." A.R. 15248. This is because the project will be engaged in data collection. It will not involve mining. It will not involve storage of mine tailings or other waste. And it will not involve the generation, storage, transport, or disposal of significant levels of hazardous waste or other substances that could contaminate groundwater. It will involve drilling wells to sample groundwater, drilling geotechnical boreholes, digging trenches to sample the subsurface, and the road and equipment operation needed to complete these activities.

The EA describes the specific ways these activities could affect groundwater: drilling could intersect groundwater systems of different water quality; disturbance of the surface could affect nearby wells or springs; groundwater will be used in testing procedures; and waste such as cuttings from wells or boreholes will be generated. A.R. 15248. The EA explains how each of these potential effects on groundwater will be minimized or eliminated. The possibility of cross-aquifer contamination in groundwater monitoring wells will be reduced by installing well casings and grouting the borehole annular space with a bentonite slurry across the unscreened sections of the wells. *Id.*

Potential well contamination from surface spills will be avoided by properly sealing and closing wells in accordance with Arizona environmental laws. *Id.* Effects on groundwater quality during drilling will be reduced by using potable and native groundwater during drilling. *Id.* Risks from surface spills will be reduced by using secondary containment structures for fuels and other lubricants used in drilling, and by parking drilling-related equipment on top of plastic sheeting overlain by absorbent material. A.R. 15249. Drill cuttings from the wells will be stored in storage tanks or lined settling pits before being transported offsite to approved disposal facilities. A.R. 15250. And purge water from deep monitoring wells will be disposed offsite if the water does not meet Arizona water quality guidelines. *Id.* These measures, the EA finds, will further reduce the limited risk of adverse groundwater effects from the data-gathering activities. A.R. 15248.

The EA includes a detailed discussion of the subsurface of the Superior Basin where the data gathering will occur, including fault blocks, faults, rock, fill, and sediments. A.R. 15239-40. The EA discusses directions and depths of groundwater flow, permeability of various rocks and sediments, and groundwater discharge points. A.R. 15239-46. Existing wells are plotted and their depths and levels of water production identified. A.R. 15244-46 (including Figure 3-3 and Table 3-4).

The Forest Service chose not to collect water samples from existing wells or surface sources to generate baseline data before the final EA was published. Doc. 38 at 34; Doc. 46 at 23-24; A.R. 15246 (noting that "[s]ite-specific water quality information is not readily available"). Instead, the EA relied on data collected from two studies of similar nearby basins. A.R. 15246. The EA notes that these studies show groundwater having a "calcium-bicarbonate groundwater signature" and "total dissolved solids concentrations below 1,000 milligrams per liter[.]" *Id.* Given the relatively small scale of the project, the Court concludes that this was reasonable.

Plaintiffs cite several cases to argue that reliance on these studies, rather than sampling and testing groundwater from existing wells, was unreasonable. In *Great Basin*

*Resource Watch*, the Ninth Circuit considered a claim that the agency had not established adequate baseline data related to air quality. 844 F.3d at 1101. The court found the agency's reliance on baseline values from a separate rural county – rather than measurements from the area to be affected by the project – to be reasonable. The Ninth Circuit explained: "Although it is true that this choice may have caused the agency to underestimate the baselines for 2.5-micron particulate matter, the BLM explained its choice adequately, and its explanation is reasonable." *Id.* at 1102. Without a showing from the plaintiffs that the agency's reliance on non-site-specific measurements was based on "inaccurate information or indefensible reasoning," the court did not question the agency's methodology for establishing baseline data. *Id.*

The court did not find the agency's action reasonable, however, when it used a zero baseline value for several remaining pollutants based on a recommendation in a single email from the Nevada Department of Environmental Protections ("NDEP"). *Id.* at 1103. The court found that the agency's decision to rely on that recommendation was arbitrary and capricious because the email contained no explanation of how or why the NDEP arrived at zero as its recommended baseline. *Id.* The court emphasized that it might reach a different conclusion if the NDEP had offered an explanation or the agency had independently found that baseline to be reasonable. *Id.* "But none of that happened – the BLM simply used baseline estimates of zero for some pollutants in reliance on one conclusory sentence in an email from an NDEP official, an email that itself contained no supporting reasoning." *Id.*

This case is different. The EA did not rely on a single sentence from an unrelated agency. It undertook a detailed description of the subsurface in the Superior Basin and looked to studies from neighboring basins, as did the portion of the BLM's analysis upheld by the Ninth Circuit in *Great Basin Resource Watch*.

Plaintiffs also rely on two district court cases to argue that the Forest Service's decision not to gather site-specific water quality data was arbitrary and capricious. Doc. 38 at 35. In *Idaho Conservation League v. U.S. Forest Service*, No. 1:11-CV-

00341-EJL, 2012 WL 3758161 (D. Idaho Aug. 29, 2012), the district court found the agency's decision not to gather data on local groundwater conditions before rendering its finding of no significant impact to be unreasonable. *Id.*, at *16. The court relied on information in the record showing that the action at issue – a mining exploration project involving the construction of over 250 boreholes of between 1,500 and 3,000 feet – would likely have significant impacts on groundwater. *Id.* Moreover, the agency appeared to have relied on surface water quality levels, but did not consider any groundwater data, whether site-specific or from a separate area. *Id.* The court found the agency's finding of no significant impact to be arbitrary and capricious because it did not establish any groundwater baseline data. *Id.* The district court did not consider the issue here: whether it was reasonable to draw inferences from groundwater in nearby basins in light of proposed data-gathering activities that are not likely to affect groundwater quality.

*Gifford Pinchot Task Force v. Perez*, No. 03:13-CV-00810-HZ, 2014 WL 3019165 (D. Or. July 3, 2014), relied heavily on *Idaho Conservation League*. *Id.*, at *29-30. In *Gifford*, the agency approved an exploratory drilling project without gathering any site-specific baseline data or ensuring there was an ongoing monitoring mechanism to respond to possible impacts to water quality at the site. *Id.*, at *25-26. The court found this decision arbitrary and capricious because the agency provided no explanation for why no baseline study was performed or why no sampling of the water had occurred in the project area. *Id.*, at *31. The court noted that "the failure to obtain onsite data before analyzing the environmental effects means that such analysis cannot possibly be based on all of the relevant information," and specifically faulted the agency for not gathering data from wells already existing on the site. *Id.*

The size and purpose of the project involved in *Gifford* were quite different from the Baseline Project. *Id.* The project involved "approximately 110,000 feet of total exploratory drilling, based on the completion of 63 drill holes with an average drill hole length of about 1,750 feet." *Id.*, at *26. In contrast, the Baseline Project involves 16

monitoring wells of between 600 and 2,000 feet. A.R. 15212. These wells will allow the gathering and monitoring of groundwater data, which will be used in the subsequent EIS of the Main Mine proposal. *Id.*[6]

To the extent *Gifford* requires site-specific baseline data in every instance, the Court respectfully disagrees. The Ninth Circuit has made clear that an agency may rely on data from similar areas, and that courts should consider the practical circumstances of the case to determine whether this non-site-specific data was sufficient to allow the agency to reasonably determine the action's environmental impact. *Great Basin Res. Watch*, 844 F.3d at 1101; *Or. Nat. Desert Ass'n*, 840 F.3d at 569-70. The Court finds it sufficient here.

What is more, "[w]hen the agency's determination is founded on reasonable inferences from scientific data, a reviewing court will not 'substitute its judgment for that of the agency.'" *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016). Courts "are not free to impose on the agency our own notion of which procedures are best. . . . Nor may we impose procedural requirements not explicitly enumerated in the pertinent statutes." *Bark*, 643 F. Supp. 2d at 1223 (quoting *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)). The Forest Service is not required to "conduct any particular test or to use any particular method, so long as 'the evidence . . . provided to support [the Forest Service's] conclusions, along with other materials in the record,' ensure that the agency 'made no clear error of judgment that would render its action arbitrary and capricious.'" *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008) (quoting *Lands*

_____

[6] Plaintiffs also rely on *Shoshone-Bannock Tribes of Fort Hall Reservation v. U.S. Dep't of Interior*, No. 4:10-CV-004-BLW, 2011 WL 1743656, at *10 (D. Idaho May 3, 2011). In that case the court noted that the lack of site-specific groundwater studies was "troubling given the existing contamination and the difficulties in remediation," but based its ruling on other factors. *Id.* It did not conclude that the failure to gather site-specific groundwater baseline data alone rendered the agency's decision arbitrary and capricious.

*Council*, 537 F.3d at 993).  The Court cannot conclude that the Forest Service's approach to baseline determinations for groundwater is arbitrary and capricious.

The Tribe argues that the Forest Service did not provide any analysis of the geological structure of the basins referenced in the EA.  Doc. 45 at 16.  This is not correct.  *See* A.R. 15239-40.  The Tribe notes that it called the Forest Service's attention to the lack of groundwater baseline conditions by providing a letter from geohydrologist, Dr. James Wells.  Doc. 39 at 13.  While this letter expresses concern about the need for the deep wells that will be constructed as part of the Baseline Project, the letter also concludes, as did the Forest Service, that the Baseline Project itself will "have only modest impact on the environment."  A.R. 16891.  It further notes the importance of the Baseline Project's data-gathering activities to assess the impact of the Main Mine Proposal.  A.R. 16888-89 ("It is certainly understandable that Resolution would need to conduct geotechnical evaluations of soils, rocks and shallow groundwater under the proposed tailings pile.").

### E.     Mitigation.

Plaintiffs argue that the Forest Service made only a cursory mention of mitigation measures and omitted a detailed analysis of their effectiveness.  Doc. 38 at 36-37.  NEPA requires an EA or EIS to discuss possible mitigation measures, including how those measures will minimize environmental consequences.  *Robertson*, 490 U.S. at 352; *see also* 40 C.F.R. § 1508.20.  Mitigation measures should "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated[.]"  *Id.*  "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective."  *S. Fork Band Council Of W. Shoshone Of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).

Plaintiffs argue that the Forest Service failed adequately to discuss the effectiveness of mitigation measures in three areas: (1) disturbance of stream channels; (2) leakage and seepage into drill holes in the area where the TSF will be located; and (3) ozone emissions.  Doc. 38 at 37-38.  Plaintiffs cite no additional examples.

Plaintiffs argue that while the Tonto Forest Plan requires the Forest Service to "avoid disturbance of stream channels to minimize effects on riparian vegetation," the EA shows that the Baseline Project will cause such disturbances. *Id.* at 37 (citing the EA at A.R. 15238). But NEPA is "purely procedural" – it does not contain any substantive environmental standards. *Ctr. for Envtl. Law*, 655 F.3d at 1005. It does not require that any identified harms "actually be mitigated," only that mitigation measures be discussed with sufficient detail. *S. Fork Band Council Of W. Shoshone Of Nev.*, 588 F.3d at 727. Thus, the fact that the Baseline Project may not comply with the Toronto Forest Plan does not by itself establish a violation of NEPA mitigation requirements. Additionally, as explained by the Forest Service in the draft EA Comment and Response Report and a subsequent Notice of Errata, the Tonto Forest Plan does not provide standards which apply to mineral management – the activity at issue here. A.R. 15571-72, 17539-45. Moreover, while the Forest Service identifies the Tonto Forest Plan as providing guidelines and practices for protecting surface and groundwater, it did so as part of its reference to the regulatory framework applicable to water resources in the project area. A.R. 15238. It did not identify the guidelines as possible mitigation measures.

Mitigation measures directly related to water resources are discussed in the water-specific section of the EA. *See, e.g.*, A.R. 15248 (installation of at least 20 feet of surface casing would prevent intermingling of shallow groundwater and lower geologic horizons); *id.* (cross-referencing regulatory requirements for well construction and abandonment that Resolution will be required to follow); *id.* (groundwater quality effects will be reduced by using environmentally friendly fluids and potable water during drilling); A.R. 15249 (discussing specialized containment structures to reduce the potential for accidental spills); *id.* (Resolution could reduce the potential for accidental spills by implementing an SPCC Plan that contains provisions to rapidly contain and clean up accidental spills). Plaintiffs do not explain how this discussion is inadequate, and it includes a detailed discussion of mitigation measures, including effectiveness, as required by NEPA. The beneficial effects of most of these measures are obvious –

preventing cross contamination of groundwater layers through the well-recognized techniques of well casings and fill material, the benefits of using secondary containment devices to catch spills, the use of environmentally friendly fluids in drilling, etc. The Court cannot accept Plaintiffs' implied demand that the EA attempt to quantify the admittedly limited effect the Baseline Project is likely to have on groundwater – Plaintiffs never dispute that it will be limited – and then attempt to explain how each mitigation measure will reduce that limited effect.

Plaintiffs argue that the Forest Service does not "provide assurance that the drill holes excavated from areas where the tailings storage facility is proposed will be sealed in a manner capable of preventing these holes/wells becoming conduits for leakage /seepage of contaminants from the hundreds of millions of tons of tailings dumped on top of the new drill holes." Doc. 38 at 38. But the project being addressed in the EA is not the TSF. The EA does not approve tailing disposal, anywhere. The EA addresses the construction and monitoring of groundwater wells for data-collection purposes, and the Court is satisfied that it adequately addresses measures to mitigate the already modest risk of any effect on groundwater.

Moreover, Plaintiffs commented on the draft EA and raised their concern that millions of tons of tailings could be placed directly on the project's holes and wells, which then could become conduits for contaminants from the tailings. A.R. 15500. The Forest Service responded by noting that the concern reflected an opinion about the possible cumulative impact of the Baseline Project and the Main Mine and lacked any "supporting reasons for the responsible officer to consider[.]" *Id*. Plaintiffs do not argue that they provided any evidentiary support for this concern, or that the EA found such an impact to be likely. The EA discussed measures that will be employed to properly abandon the Baseline Project's wells and holes and thus to minimize impacts on groundwater. A.R. 15216-17, 15248. It also notes that analysis of the Main Mine proposal and TSF will be discussed more thoroughly in the EIS. A.R. 15252. Where the TSF is not approved by this EA, but will be considered in the EIS of the Main Mine, the

Court does not find the Forest Service's analysis of mitigation measures insufficient. *See Ctr. for Envtl. Law*, 655 F.3d at 1010.

With respect to ozone and air quality, the Forest Service discussed several mitigation measures. The Forest Service noted that particulate matter emissions will be limited by applying water to roads and affected ground surfaces during construction, imposing special speed limits for vehicles on unpaved roads, and using water during drilling. A.R. 15323. The Forest Service also discussed how "the use of mobile and portable construction equipment with recently manufactured diesel engines and the use of ultra-low sulfur diesel as fuel will minimize nitrogen oxides, carbon monoxide and sulfur dioxide emissions." *Id.* Emphasizing the temporary nature of the Baseline Project and the fact that the prominent wind direction in the area is to the east, the Forest Service found that these mitigation measures would decrease any already minimal impact on air quality in the area. *Id.* Plaintiffs appear to repeat their argument concerning the Forest Service's failure to model the impact of the Baseline Project on ozone levels. The Court has already rejected this argument.

The Forest Service also provides a list of proposed mitigation measures related to other resources, and discusses them in the various resource-specific sections throughout the EA. A.R. 15219-23, 25-26. The Court finds that the Forest Service provided a reasonably detailed assessment of mitigation measures and their effectiveness.

**F.    FONSI.**

"[A]n EIS must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) (quotation marks and citations omitted); 40 C.F.R. § 1508.27 (providing ten factors to consider when evaluating whether an impact will be significant). Plaintiffs contend that the Baseline Project will have a significant impact on the environment and thus requires an EIS for three reasons: (1) the cumulative impact of the Baseline Project with other actions threatens to violate the NAAQS related to ozone; (2) the likelihood of the ozone standard

being violated "affects public health or safety"; and (3) the Baseline Project will result in a significant impact when its cumulative impact with other actions is properly considered. Doc. 38 at 40.  For reasons explained above, Plaintiffs have failed to show that the Forest Service violated NEPA in any of these ways.  As a result, they have not shown that the EA and FONSI are arbitrary or capricious.

## G. Organic Act and Mining Regulations.

Plaintiffs argue that the Forest Service's failure to properly consider the impact of the Baseline Project on ozone levels also violates the Organic Act's requirement to minimize adverse environmental impacts, and relevant mining regulations requiring operators to comply with the Clean Air Act.  Doc. 38 at 41-42; 36 C.F.R. § 228.8. Plaintiffs provide no new arguments to support these alleged violations, but repeat earlier contentions that the Baseline Project will cause a violation of the NAAQS and that the Forest Service did not adequately assess mitigation measures.  Because the Forest Service acted reasonably when it determined that the Baseline Project will not have a significant impact on ozone levels, the Forest Service did not violate the Organic Act and mining regulations.

## H. Tribe's Additional Arguments.

### 1. Meaningful Consultation.

The Tribe argues that the Forest Service failed to engage in meaningful consultation with the Tribe in violation of § 106 of the NHPA.  Doc. 39 at 13-14.  It asserts that the Forest Service attempted to rely on a 2015 ethnographic study of the Superior area to satisfy the consultation requirement, but that this study was intended simply as a tool to encourage informed consultation.  *Id.* at 16.  Defendants argue that NHPA guarantees only a reasonable opportunity for meaningful consultation, and that the Forest Service undertook repeated efforts to engage with the Tribe and provide opportunities for the Tribe to participate in the EA.  Doc. 41 at 16-23, 65-67.

Section 106 requires federal agencies to "take into account the effect of [an] undertaking on any historic property."  54 U.S.C. § 306108.  "Like NEPA, section 106 of

NHPA is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs." *Te-Moak*, 608 F.3d at 607 (citation and quotation marks omitted, alteration incorporated). Federal agencies must consult with tribes that "attach[ ] religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. § 800.2(c)(2)(ii). "Consultation should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties." *Id.* § 800.2(c)(2)(ii)(A); *accord. Te-Moak*, 608 F.3d at 608. But the law directs agencies only to ensure that tribes are afforded "a reasonable *opportunity* to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, . . . articulate its view on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii)(A) (emphasis added).

Defendants set out a detailed explanation of their efforts to consult with the Tribe. Doc. 41 at 16-23, 65-67. The Tribe does not appear to dispute any of these facts, but rather concedes that the "Tribe and USFS made several attempts to arrange face-to-face consultation meetings without success." Doc. 39 at 14.

In 2013, the Forest Service and the Tribe entered into a memorandum of understanding pursuant to which they would cooperate to conduct an ethnohistoric /ethnographic study of the Superior area ("Study"). A.R. 3029-33. Defendants assert that the Forest Service communicated extensively with the Tribe and provided multiple opportunities for in-person government-to-government consultation beyond preparation of the Study. Doc. 41 at 17. For example, on May 13, 2014, Defendants sent a letter to the Tribe summarizing the Baseline Project and its current status and seeking "information regarding places in [the] area that may have traditional cultural or religious significance." A.R. 6316. The letter also summarized and attached a copy of an April 2014 report from Wetland Resources, Inc., a company that was contracted by Resolution to analyze the Baseline Project area and locate and document any and all cultural

resources that might be adversely affected by the Baseline Project. A.R. 6316. The Tribe responded with its own letter, contending that any scoping or analysis of the Baseline Project would be premature while the Study is incomplete and asking the Forest Service to postpone the public comment period pending the Study's completion. A.R. 6925.

The Forest Service wrote again on August 21, 2014, declined to extend the public comment period, but assured the Tribe that its concerns would "be accepted at any time during the [NEPA] process." A.R. 8042-43. The Forest Service also assured the Tribe that the Study would be completed prior to a final decision on the Baseline Project and would be considered along with the concerns of the Tribe. A.R. 8044. The Forest Service ended the letter by encouraging the Tribe to engage in face-to-face- consultation with the Forest Service. A.R. 8048. It provided a phone number and contact person to arrange a meeting. *Id.*

On March 15, 2015, the Forest Service sent another letter to the Tribe with a copy of the draft EA, informing the Tribe of its conclusion that the Baseline Project would not affect any of the known archeological sites identified by Wetland's report. A.R. 9632. The letter emphasized that information from the Study, once completed, would be considered before any final decision was made on the Baseline Project. *Id.* The letter further requested comment on the draft EA, offered to engage in in-person consultation, and provided a point of contact to arrange a consultation or request additional information. A.R. 9633-34.

The Tribe responded in a letter dated April 13, 2015, noting its appreciation for the invitation for in-person consultation but expressing its preference to communicate via letter. A.R. 13285. The Tribe further noted that it had several officials and personnel with a direct interest in the Baseline Project, but that some coordination between those individuals would be required before meaningful consultation with the government could occur. *Id.* The Tribe requested the contact information for personnel who would be involved in the consultation on behalf of the Forest Service, and requested that future communications regarding consultation be directed to Chairman Terry Rambler. *Id.* In a

letter to Chairman Rambler dated April 30, 2015, the Forest Service provided the names, roles, and phone numbers of the Forest Service personnel who would be involved in consultation on behalf of the federal government and invited the Tribe to contact them to arrange a meeting. A.R. 13353.

The Study was completed on September 14, 2015. A.R. 14158. The summary noted that it was intended to identify the traditional cultural properties in the area for purposes of NHPA and NEPA, and that it would be used to ensure that the Main Mine complied with relevant federal laws and policies. A.R. 14162. It further noted that ten Native American tribes, including the Tribe, participated in the Study. *Id.* The study identified 378 Western Apache traditional cultural properties in the Superior area, as well as 46 springs of cultural importance. A.R. 14217.

The Forest Service held three in-person consultation meetings with other Western Apache tribes to discuss how the Study impacted the assessment of the Baseline Project and ways to mitigate potential impacts to sites identified in the Study. A.R. 14113-16 (August 14, 2015 meeting notes); A.R. 14432-34 (September 24, 2015 meeting notes); A.R. 14535-39 (October 21, 2015 meeting notes). The Tribe sent a representative to the last of these three meetings. A.R. 14535. The meeting notes specifically state, however, that this representative said she was in attendance simply to take notes, not to engage in consultation. *Id.* At this meeting, the Forest Service proposed several measures to address concerns raised by the tribes at previous meetings. A.R. 14535-39. One of these proposals included a decision to not authorize or to relocate any geotechnical boreholes, monitoring wells, or trench excavations within 1,200 feet of perennial springs in the Baseline Project area. A.R. 14537. The tribes approved these proposals, which were then adopted in the final EA. A.R. 14538-39; A.R. 15299.

On October 27, 2015, shortly after this last meeting, the Tribe sent a letter to the Forest Service. A.R. 14724. The letter indicated that the Tribe had not yet "requested government-to-government consultation" regarding projects related to Resolution Copper Mining and that it intended to request such consultation, but not at this time. *Id.*

The Forest Service then met with representatives of the Tribe and several other tribes on January 13, 2016 to discuss the final EA and FONSI.  A.R. 15146-50.  The final EA and FONSI were published on January 15, 2016.  A.R. 15159, 15163, 15178.  The final EA notes the consultation process between the Forest Service and the tribes, including the dates of correspondence and meetings.  A.R. 15202.  It asserts that the Forest Service sent the scoping letter and Wetland's report to ten tribes, inviting them to engage in consultation; that eight tribes responded to the letter to initiate NHPA § 106 consultations; and that the Forest Service engaged in in-person consultation with all eight tribes except the Tribe.  *Id.*

The Tribe objected to the final EA and FONSI on February 29, 2016, asserting that it "did not have the benefit of the Study when it provided its previous comments.  Now that the Tribe has the Study it should be given the opportunity to further comment upon [the Baseline Project] in government-to-government consultations with [the Forest Service] on the impacts of Resolution's Baseline activities on traditional cultural resources and sites."  A.R. 16882.  The Forest Service responded by proposing several dates for a meeting.  A.R. 16894.  The Forest Service and the Tribe ultimately met on April 6, 2016, although it is not clear if the EA and FONSI of the Baseline Project were discussed, as the Tribe expressed in a letter on that same date that it believed consultations at that time were too late.  A.R. 17178, 17198.  The administrative record indicates that the Forest Service continued to reach out to the Tribe to set up meetings to discuss the Tribe's objections to the final EA and FONSI.  A.R. 17297-99, 17324-35.

The Tribe ultimately did not agree to meet with the Forest Service and sent a letter lamenting that it was unable to send a representative to meet in person, and including another explanation of its comments and objections.  A.R. 17351-53.  The Deputy Regional Forester eventually addressed the Tribe's objections without an in-person meeting.  A.R. 17378-81.

As stated, the Tribe does not contest these facts or provide any material contrary facts.  Nor does it identify any cultural sites that were not properly considered in the EA.

*See Te-Moak*, 608 F.3d at 610 ("In addition, the Tribe has made no showing that it would have provided new information had it been consulted again earlier in the Amendment's approval process."). What is more, the Tribe does not appear to contest the Forest Service's ultimate finding that the Baseline Project "would result in no increment to the cumulative effects of past, present, and reasonably foreseeable actions on cultural resources." A.R. 15299. Instead, the Tribe contends that the actions of the Forest Service as described above do not constitute meaningful government-to-government consultation. Doc. 45 at 17-18. It contends that "placing telephone calls" and "sending emails or correspondence suggesting a meeting date and time" are not sufficient to satisfy the consultation requirement, but does not identify any other actions the Forest Service should have taken. *Id.* at 18. Consultation is a two-way street. The administrative record makes clear that the Forest Service made numerous and substantial efforts to consult, while the Tribe made no meaningful effort to engage with the Forest Service. Were the Court to find that an agency had not satisfied the NHPA's consultation requirements simply because no actual consultation occurred, a tribe could block any undertaking by refusing to cooperate. The NHPA does not guarantee actual meaningful consultation, only that the tribe will have a reasonable opportunity for such consultation. The Tribe had such an opportunity here.

The Tribe relies on *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010), which found that the agency had not engaged in meaningful consultation under the NHPA when the agency's "invitation to 'consult' . . . amounted to little more than a general request for the Tribe to gather its own information about all sites within the area and disclose it at public meetings." *Id.* at 1118. No letters from the agency initiated government-to-government contact with the Tribe, and the agency actually "rebuffed" the tribe's request that the agency meet with the tribal council. *Id.* at 1119. The agency did not provide the Tribe with adequate and timely information, including identification of relevant properties

where the action would occur.  *Id.* at 1118.  The situation in *Quechan Tribe* is a far cry from the facts before the Court.

### 2. Section 3003 of the National Defense Authorization Act.

The Tribe argues that the Forest Service violated § 3003 of the NDAA by analyzing the Baseline Project in an independent EA, rather than in a single EIS with the Main Mine Proposal.  Doc. 39 at 19-23.  The Southeast Arizona Land Exchange and Conservation is one of several riders added to the NDAA in 2015 as § 3003.  Pub. L. No. 113-291, § 3003.  The purpose of this legislation "is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States."  16 U.S.C. § 539p(a).  Accordingly, "if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to the non-Federal land, the Secretary is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land."  16 U.S.C. § 539p(c)(1); *see* § 539p(b)(2), (4) (defining "non-Federal land" and "Federal land" for purposes of this provision).

The Tribe specifically argues that the Forest Service violated § 539(c)(9).  This section states that unless otherwise provided, the land exchange shall be carried out in accordance with NEPA.  16 U.S.C. § 539p(c)(9)(A).  It adds:

> Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

16 U.S.C.A. § 539p(c)(9)(B).  The Tribe argues that the plain language of this provision required the Forest Service to analyze the Baseline Project and the Main Mine in a single EIS.  This argument fails for several reasons.

First, the Tribe has not shown that this statute provides a cause of action for it to challenge the EA.

Second, even if the Tribe has a cause of action, the plain language of the section does not support the Tribe's contention. The legislation provides for the use of "separate environmental review documents prepared in accordance with the [NEPA] or other applicable laws for exploration or other activities not involving (i) the land exchange; or (ii) the extraction of minerals in commercial quantities by Resolution Copper on or under the Federal land." 16 U.S.C.A. § 539p(c)(9)(D). The Baseline Project is an exploratory action that falls squarely within this language. As the Court has already noted, approval of the Baseline Project will not approve or authorize construction of the Main Mine, nor will it sanction any land exchange. Rather it will provide data for the Forest Service to consider more accurately the impact of the Main Mine Proposal. Moreover, the Baseline Project is not a "major Federal action[] significantly affecting the quality of the human environment," as the Court has upheld the EA and FONSI.

The Tribe appears to argue that the Forest Service's approval of the Baseline Project also approves the construction of the TSF (Doc. 39 at 21), but that is not the case. The Baseline Project will gather data to assess the impact of the TSF as put forward in the Main Mine Proposal. Ultimate approval of the TSF and the Main Mine will depend on a subsequent ESI. As a result, the Tribe has not shown that the Forest Service violated the terms of § 3003 of the NDAA.

**IT IS ORDERED:**

1.      Plaintiffs' motions for summary judgment (Docs. 38, 39) are **denied**.

2.      Defendants' motions for summary judgment (Docs. 40, 42) are **granted**.

3.      The Clerk is directed to enter judgment and terminate this action.

Dated this 6th day of September, 2017.

David G. Campbell
United States District Judge

- 59 -